*VIRGINIA:*

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

**MARTIN MISJUNS,**               )
                                  )
    **Plaintiff,**                )
                                  )
v.                                )  *Case No.*  C L  2( 0 0 0 2 9 5 - 0 0
                                  )
**LYNCHBURG FIRE DEPARTMENT,**    )
                                  )
    **Serve:**                    )
    *Walter Erwin, Esq.*          )
    *900 Church Street*           )
    *Lynchburg, VA 24504*         )
                                  )
**CITY OF LYNCHBURG,**            )
                                  )
    **Serve:**                    )
    *Walter Erwin, Esq.*          )
    *900 Church Street*           )
    *Lynchburg, VA 24504*         )
                                  )
**MARY JANE TOUSIGNANT DOLAN,**   )
*(Sued in her official capacity)* )
                                  )
    **Serve:**                    )
    *Mary Jane Tousignant Dolan*  )
    *611 Heritage Dr.*            )
    *Lynchburg, VA 24503*         )
                                  )
**BEAU WRIGHT**                   )
    *(Sued in his official capacity)* )
                                  )
    **Serve:**                    )
    *Beau Wright*                 )
    *801 Madison St.*             )
    *Lynchburg, VA 24504*         )
                                  )

1

*REID WODICKA*                                    )
    *(Sued in his official capacity)*               )
                               )
    *Serve:*                                     )
    *Reid Wodicka*                               )
    *900  Church St.*                            )
    *Lynchburg, VA 24504*                        )
                               )
    *Defendants*.                                )

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW your Plaintiff, Martin Misjuns, and propounds this Complaint against the City of Lynchburg, the Lynchburg Fire Department, Mary Jane Tousignant Dolan, Beau Wright and Reid Wodicka for discriminatory employment practices and constitutional violations. In support thereof, Plaintiff states as follows:

### I.    INTRODUCTION

1.    This is an action alleging breach of contract and conspiracy to deprive Plaintiff of his constitutional rights, by (1) the defendant City of Lynchburg, (2) defendant Lynchburg Fire Department ("LFD") or "the Department"), an agency of the City of Lynchburg acting by the authority of the City of Lynchburg,  by and through its servants, agents and employees, and defendants (3) Mary Jane Tousignant Dolan (4) Beau Wright and (5) Reid Wodicka, against Plaintiff Martin Misjuns ("Misjuns"). Plaintiff alleges that he was subjected to a pattern of intimidation and harassment by superior officers of LFD, and arbitrarily and capriciously denied training required for promotions within LFD, and that the Defendants conspired to subject him to adverse employment actions because of political and religious speech engaged in by Plaintiff, in violation of the First Amendment to the United States Constitution, Article I, Section 12 of the

Constitution of Virginia, and the "Employment Policies and Procedures Handbook" of the City

of Lynchburg, Virginia. The Department is an agency of the City of Lynchburg ("the City").

Plaintiff seeks damages pursuant to 42 U.S.C. Section 1983 for employment discrimination in

violation of his First Amendment rights.

## II. PARTIES

2.      Plaintiff Martin Misjuns is a natural person, a citizen of the United States and the

Commonwealth of Virginia, a resident of the City of Lynchburg, a captain in the Lynchburg Fire

Department, and a union representative with the IAFF Local #1146, the Lynchburg division of

the International Association of Fire Fighters labor union.

3.      The City of Lynchburg is an independent city and a municipal corporation under the laws

of the Commonwealth of Virginia.

4.      The Lynchburg Fire Department is an agency of the City of Lynchburg, which city is a

municipal corporation within the Commonwealth of Virginia.

5.      Mary Jane Tousignant Dolan ("Dolan") is a natural person, a citizen of the United States

and the Commonwealth of Virginia, a resident of the City of Lynchburg, and the Mayor of the

City of Lynchburg.

6.      Beau Wright ("Wright") is a natural person, a citizen of the United States and the

Commonwealth of Virginia, a resident of the City of Lynchburg, and the Vice-Mayor of the City

of Lynchburg.

7.      Reid Wodicka ("Wodicka") is a natural person, a citizen of the United States and the

Commonwealth of Virginia, a resident of the City of Lynchburg, and the City Manager of the

City of Lynchburg.

### III. JURISDICTION AND VENUE

8.    This Court has jurisdiction pursuant to § 17.1-513 of the Code of Virginia.

9.    Venue is proper in this Court pursuant to § 8.01-262, as Plaintiff is a resident of the City

of Lynchburg, the Defendants are the City of Lynchburg, an agency of the City of Lynchburg,

and the Mayor, Vice-Mayor and City Manager of the City of Lynchburg, and the actions

complained of occurred in the context of Plaintiff's work as an employee of an agency of the

City of Lynchburg, and within the limits of the City of Lynchburg.

### IV. BACKGROUND

10.    Plaintiff is a Fire Captain employed by the Defendant Lynchburg Fire Department.

11.    Gregory Wormser is LFD's Fire Chief, and senior officer. Wormser is an agent of the

Department, and the City of Lynchburg. In his duties as Fire Chief, Wormser acts under color of

law.

12.    Underneath Chief Wormser, LFD has a command structure of Deputy Chiefs. Jonathan

Wright ("Wright") and Robert Lipscomb ("Lipscomb") are Deputy Chiefs.

13.    Below the Deputy Chiefs in command are the Battalion Chiefs. Danny Williams

("Williams"), Allen Carwile ("Carwile") and Sean Regan ("Regan") are Battalion Chiefs.

14.    Below the Battalion Chiefs are Fire Captains. Plaintiff Misjuns is a Fire Captain.

15.    Misjuns is also an official with IAFF Local 1146, the Lynchburg chapter of the

International Association of Fire Fighters.

16.    In his capacity with the IAFF, Plaintiff has the responsibility of bringing complaints of

alleged wrongful employment practices from individual union members to the attention of LFD.

4

17.     At all relevant times, Dolan was Mayor, Wright was Vice-Mayor, and Wodicka was City Manager of the City of Lynchburg, charged with handling personnel matters and enforcing the laws and policies of the City.

### A. LFD's Discriminatory Training and Promotion Practices

18.     Plaintiff has continued his education within the Department, in hopes of future promotion to Battalion Chief. Fire Officer II ("FOII") training was the only class needed for Plaintiff to meet the requirements for promotion to Battalion Chief upon reaching the time in grade requirement.

19.     On May 20, 2019, Deputy Chief Lipscomb issued a memorandum regarding 28 fire fighters who were receiving promotions. The memo did not include Plaintiff, although he was pending promotion to his current position of Fire Captain.

20.     Plaintiff raised the omission to Regan. Upon receiving the complaint, Regan confirmed that the promotion was indeed pending.

21.     In June of 2019, Wormser and Wright met informally with Plaintiff to discuss his upcoming promotion from Master Fire Fighter to Fire Captain.

22.     Plaintiff asked to be promoted in time for the upcoming two-percent general City-wide wage increase to be applied to the higher rate of pay he would receive as a Fire Captain.

23.     Wormser stated that he "would always do everything to put the most money in our people's pockets."

24.     However, Plaintiff was not promoted to Fire Captain until after the general two-percent wage increase was received, preventing the two percent from applying to his higher pay as a Fire Captain.

25.     Plaintiff continued to repeatedly follow up on the issue. Finally he spoke with Chief
Wormser again on November 5, 2019.

26.     Wormser told Plaintiff that he was continuing to work on the pay increase, and that it had
not come through because Human Resources thought Plaintiff was making too much money.

27.     Meanwhile, multiple fire fighters had addressed Plaintiff in his capacity with the IAFF,
alleging bias in the selection of fire fighters for trainings required for promotions.

28.     On December 24, 2019, Plaintiff sent an email from his IAFF email address to LFD
leadership, addressing complaints from union members. Several members alleged unequal
Department  practices in offering training opportunities, which were required for promotion
within the Department, to some firefighters and not others.

29.     Plaintiff also filed a Freedom of Information Act ("FOIA") request with the Department,
seeking information to shed light on the allegations of bias in training selection.

30.     Plaintiff himself was seeking approval to take the FOII training he needed for promotion
to Battalion Chief.

31.     On December 30, battalion chief Williams sent a reply, but sent it to plaintiff's city fire
department email address, not the private IAFF address from which Plaintiff had sent the FOIA
request. The reply was evasive and did not include all documents responsive to the FOIA
request.

32.     On January 1, 2020, Plaintiff sent an emailed reply to Williams. Plaintiff advised that
Williams' response was incomplete, and that Williams' decision to respond to Plaintiff as a
subordinate in the Department when the request had been made on behalf of the IAFF appeared
to be intended to intimidate Plaintiff for exercising his union responsibilities.

33.     The next day, Williams sent an email listing names of firefighters approved for FOII certification training, for which Plaintiff had applied. Plaintiff's name was not on the list.

34.     On January 7, 2020, Plaintiff spoke to his immediate supervisor inquiring as to the reason for his omission from FOII training. The supervisor promised to investigate.

35.     On January 23, Plaintiff inquired of Deputy Chief Williams why he had been passed over for FOII training. He stated to Williams his belief that the omission appeared to be intimidation in response to Plaintiff's work on behalf of the union.

36.     Plaintiff also reminded Williams of the promise from Wormser that he would be promoted in time to receive the two-percent increase, but he was not.

37.     The following day, the FOII training occurred. Because he had not been approved, Plaintiff stayed home with his children so his wife could go to work.

38.     IAFF Local 1146 President Jamie Maxwell, who was attending the training, confirmed with the instructor that Plaintiff's name was not on the approved list.

39.     During the class, Wormser and Wright asked Maxwell where Plaintiff was. Maxwell responded that since he had not been approved for the class, he was probably at home.

40.     Maxwell then observed a "tense" conversation between Wormser, Wright and Williams.

41.     The following day, Wormser called Plaintiff and stated that he "thought everything had been worked out," and advised that the Department would engage an instructor to provide the class one-on-one.

42.     The instructor was eventually engaged to provide the one-on-one training, but the missed session had to be made up before the next session was scheduled. On such short notice, Plaintiff was unable to obtain child care to get the session completed before the next scheduled session.

43.     To date, the Department has not provided the class.

44.     On information and belief, the Department has already provided the training class to every other fire captain who submitted a request to take the class.

45.     In addition, the Department issued a laptop computer to every other Fire Captain except Plaintiff.

46.     On July 5, 2019, when Plaintiff asked Wright how to get a laptop, Wright replied, "You're the Captain now, you tell me."

47.     Plaintiff has repeatedly followed up, most recently by submitting a trouble ticket through the Department of Information Technology on March 3, 2020.

48.     The Department still refuses to issue a laptop to Plaintiff, and Plaintiff has had to continue to use his personal laptop to conduct required business for the Department in the course of his employment.

49.     The Department has made no explanation for the disparate treatment afforded between Plaintiff and the other Fire Captains.

### B. Defendants' Retaliation for Plaintiff's Expression of Speech and Religion

#### 1. Defendants Punished Plaintiff due to Union Support of Republican City Council Candidates

50.     On March 13, 2020, at the instruction of Captain Jennifer Collins, Plaintiff and his fire crew began the task of removing furniture, carpentry and cabinets from a "shop" room at the fire station. The room was being prepared to receive fitness equipment for the use of firefighters while on duty.

51.     In the spring of 2020, IAFF Local 1146 made the decision to support candidates for Lynchburg City Council who were affiliated with the Republican Party, against candidates

supported by the Democrat majority on City Council, which majority includes Dolan and Wright. Plaintiff, the Ward I Chair for the Lynchburg Republican City Committee, also supported the Republican candidates in his role with Local 1146.

52.     Deputy Chief Wright immediately began a pattern of harassing behavior that created a hostile work environment for Plaintiff.

53.     The same day, Wright sent Plaintiff a text message that he did not approve of Local 1146's post supporting the Republican-affiliated candidates, and that he expected it to be removed.

54.     On April 21, Wright approached Plaintiff while on duty and asked angrily, "Did you get my text message?" Plaintiff replied, "Yes."

55.     Wright stated, "that's all I needed to know. Have a great day. He then left the fire station, got into his vehicle, and left.

56.     Wright's manner was so threatening that Fire Fighter Eric Smith, who was also present, asked Plaintiff, "Did he come here just to intimidate you?" Plaintiff replied that it certainly appeared so.

57.     Plaintiff immediately sent an email to Battalion Chief Carwile to register a complaint.

58.     Carwile emailed Chief Wormser to alert him that Plaintiff believed Wright was trying to "intimidate and bully him" for his political expression with IAFF.

59.     Carwile stated, "The actions of Chief Wright must have been clear if a subordinate firefighter [Smith] found his actions to be bullying in nature. Captain Misjuns wants to ensure that his union activities are protected and that he will be free from any intimidation, bullying or retaliation from department administration or city staff. Any such activities could be perceived

by Captain Misjuns as creating a possible hostile work environment for him due to his union activities."

60.     In several personal conversations around the same time period, Carwile told Plaintiff that the City was preparing a "Counseling Report" related to Plaintiff's work clearing the shop room at the fire station. During those conversations, Carwile stated that he had been ordered to write the report by Deputy Chief Lipscomb although he personally believed the report was unnecessary, and expressed displeasure that the City was preparing a Counseling Report independently of the standard LFD chain of command. He also stated multiple times to Plaintiff that Deputy Chief Wright was "on the warpath" against Plaintiff. Carwile stated that the City of Lynchburg "had never seen anything like" the negative reaction to Plaintiff's support for the Republican candidates, and that he believed the order to prepare the Counseling Report could be retaliation for the political expression by Plaintiff and the union.

61.     Shortly thereafter, on May 3, 2020, in response to Plaintiff's good-faith report of workplace discrimination, the Department placed in Plaintiff's personnel file a "Counseling Report" ("the Report"). The Report stated that the ceiling tile removal should have been cleared with senior Department staff before it was undertaken, and advised Plaintiff to clear any such work with superiors in the future. A copy of the Report is attached as Plaintiff's Exhibit 1.

62.     Plaintiff quickly responded to Carwile with a written objection to the filing of the Report in his personnel file, reminding Carwile of the personal discussion referenced in Paragraph 60 *supra*. A copy of Plaintiff's Objection is attached as Plaintiff's Exhibit 2.

63.     Plaintiff expressed his belief that the Counseling Report, in effect a reprimand, had been placed in his personnel file by way of retaliation for his activities on behalf of Local 1146, related to the union's support of Republican-affiliated City Council candidates.

64.     Likewise, on June 8, 2020, in response to Plaintiff's good-faith report of workplace discrimination, when Plaintiff arrived at work, the Department instructed him to undergo questioning with attorney Jennifer Royer. After less than an hour's notice, Plaintiff was questioned for over three hours.

65.     Following the interrogation, Chief Wormser gave Plaintiff a letter on November 2, 2020. In the letter, the City of Lynchburg alleged that Plaintiff's claims were unsupported and impliedly baseless. A copy of Chief Wormser's letter is attached as Exhibit 3.

### 2. Defendants Punished Plaintiff due to his Personal Political and Religious Statements on Matters of Public Concern

66.     Plaintiff maintains two Facebook social media pages. One is a "personal page" identifying him as "Marty Misjuns." The other is a "public figure" page, identifying Plaintiff as "Martin J. Misjuns, Ward I Chair - Lynchburg Republican City Committee." Neither page identifies Plaintiff as a Fire Captain or a city employee.

67.     On both his "personal" and "public figure" pages, Plaintiff routinely posts political messages.

68.     On February 1, Plaintiff posted a "meme" on his "public figure" page. The meme read, "In the beginning, God created Adam & Eve. Adam could never be a Madam. Eve could never become Steve. Anyone who tells you otherwise defies the one true God." A copy of the meme is attached as Plaintiff's Exhibit 4.

69.     The meme expressed Plaintiff's deeply held religious beliefs.

70.     On January 26, 2021, Plaintiff posted on his "public figure" page four editorial cartoons drawn by cartoonist A.F. Branco. Two of the cartoons depict a person with facial hair coming out of a women's bathroom to the consternation of female figures drawn nearby. One depicts a large

person with facial hair and dressed in women's clothing saying, "Hey federal government! Get out of our bedroom… We need you in the bathroom." The fourth depicts an exaggeratedly large person with an "Equality Act" t-shirt playing sports against an exaggeratedly small woman who yells, "Not fair!" Above the cartoons, Plaintiff posted the statement, "#BidenErasedWomen - Coming to your daughter's high school locker room in the near future." Copies of Plaintiff's Facebook post and the cartoons are attached as Plaintiff's Exhibit 5.

71.     The post is clearly satirical, and clearly intended to express opposition to the "Equality Act," which would require an end to separate-sex bathrooms and locker rooms in school facilities, including public, private, and religious schools.

72.     The advisability of the "Equality Act," or the lack thereof, is clearly a matter of public concern, which has generated massive opposition from participants in girls' sports programs and persons concerned about the effects of the Act on religious freedom.

73.     The cartoons are protected free speech.

74.     No less protected is Plaintiff's right to re-post the cartoons.

75.     No less protected is Plaintiff's right to add his own personal comments which reveals his intent in reposting the editorial cartoons - his belief that the Act should be opposed out of concern that it will impose severe costs on women and girls in restroom facilities and sports programs.

76.     However, on March 25, 2021 and, on information and belief, in response to instructions from one or more of Dolan, Wright and Wodicka, Wormser sent Plaintiff a letter ordering him  to attend an "interrogation" on Monday, March 29, to discuss several "citizen complaints" attacking Plaintiff for posting the cartoons and the meme. A copy of Wormser's letter is attached as Plaintiff's Exhibit 6.

77.     On information and belief, there were a relative handful of "citizen complaints," and most of those came from individuals affiliated with the LGBTQ group "Hill City Pride."

78.     Wormser also informed Plaintiff that he was under investigation for social media statements making political criticism of Dolan, after Dolan sought to have city staff retaliate against Plaintiff for posting the cartoons.

79.     Wormser cited language in the "complaints" calling Plaintiff "vile," "hateful," "bigoted," "dehumanizing," "hostile," and "dangerous" for posting the cartoons and the meme.

80.     In his letter, Wormser attempted to impose a gag order on Plaintiff, stating, "You are ordered not to discuss this matter in any manner with anyone other than: your religious leader, your counselor, your immediate chain of command, your observer…, and those assigned to conduct this investigation."

81.     Any time an employee of the Department is subjected to an "interrogation," a report of the interrogation is placed in the employee's file. All such reports are considered in determining whether the employee will be retained, fired, promoted or demoted.

82.     Subjecting Plaintiff to an "interrogation" and placing a report on the interrogation in his employee file constitutes adverse employment action, all based exclusively on Plaintiff's private, political speech on matters of public concern.

83.     None of the "citizen complaints" alleged that Plaintiff had in fact exercised any partiality toward anyone in the conduct of his job as a firefighter, or questioned any acts or statements made by Plaintiff in the course of performance of his job duties.

84.     In response to the "citizen's complaints," Mayor Mary Jane Tousignant Dolan ("Dolan"), City Manager Reid Wodicka, and Vice Mayor Beau Wright began to conspire together to deny

Plaintiff his constitutional rights to express his deeply held religious beliefs and political views on matters of public concern.

85.    Dolan and Wright are partisan Democrats, while Plaintiff's "public figure" page identifies him as Ward I Chair for the Lynchburg Republican City Committee.

86.    Wright served in the administration of Barack Obama as Senior Deputy Director of Operations and Director for Finance.

87.    According to the Virginia Public Access Project ("VPAP"), Dolan has made over $20,000 in Virginia political donations. Nearly all donations were to Democrats, including Governonr Ralph Northam and Attorney General Mark Herring. A handful were to independents. None were to Republicans. A copy of the VPAP online page listing Dolan's donations is attached as Plaintiff's Exhibit 7.

88.    On January 29, 2021, Dolan sent an email to Wodicka, stating, "This needs to be addressed! We need to have zero tolerance for this type of activity on the part of City employees. I know that this is not the first time this person has displayed questionable if not unconscionable rhetorical post [sic] on his social media platforms…. Please let's talk about a meeting to discuss." A copy of Dolan's email is attached as Plaintiff's Exhibit 8.

89.    On February 3, 2021, Wodicka sent an email reply to "citizen complainant" Jennifer Staton. Wodicka wrote, "I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the City intends to create or support… Please understand that this is a personnel matter that will be addressed appropriately…." A copy of Wodicka's email to Staton is attached as Plaintiff's Exhibit 9.

90.    On February 4, 2021, Wodicka replied to Dolan by email, copying Dolan and Wright, "Mary Jane: Beau and I just spent some time talking this over. Maybe you and I can talk about it a little more tomorrow." A copy of Wodicka's email is attached as Plaintiff's Exhibit 10.

91.    Dolan has continued to press her campaign to convince other City leadership to retaliate against Plaintiff for expressing his deeply held religious beliefs. In an email to "citizen complainant" Michael Kittinger, Dolan wrote, "I was speechless when I saw what Mr. Misjuns posted. I am totally in agreement with you and do not support or will not tolerate this type of malicious rhetoric. No question his comments are unconscionable, and City Leadership needs to take action."[1]

92.    On information and belief, some or all of Defendants Dolan, Wodicka and Wright then directed Defendant Wormser to initiate an "interrogation" of Plaintiff for expressing his deeply held religious views and political speech.

93.    Further, Defendants' retaliation against Plaintiff stands in stark contrast to their treatment of Wormser, who attended and supported a protest put on by the group "Black Lives Matter" ("BLM") on July 4, 2020, at Miller Park in Lynchburg.

94.    Wormser attended and participated in the protest in full LFD uniform.

95.    Unlike Plaintiff's actions, which he took out of uniform and on personal time, Wormser's actions were in violation of the City's "Employment Policies & Procedures" handbook. The handbook states in Chapter 7, Article I, Section H.1, "City employees may participate in political activities while they are off duty, **out of uniform** and not on the premises or their employment with the City" (emphasis added).

96.    A photograph of Wormser in uniform at the protest is attached as Plaintiff's Exhibit 11.

---

[1] See Lou Chibarro, Jr., "Washington Blade," March 17, 2021, "Lynchburg fire captain denounced for transphobic Facebook post," available at https://www.washingtonblade.com/2021/03/17/lynchburg-fire-captain-denounced-for-transphobic-facebook-post/

97.     On information and belief, Defendants took no adverse employment action against Wormser, nor did they even question his attendance at a political rally in full uniform.

## COUNT ONE - BREACH OF CONTRACT
### (Against Defendants City of Lynchburg and Lynchburg Fire Department)

98.     Plaintiff hereby incorporates by reference Paragraphs 1 to 97 as if fully restated herein.

99.     The City of Lynchburg's "Employment Policies & Procedures" handbook constitutes a binding contract between Plaintiff as employee, and Defendants as employers.

100.    The Handbook details the behaviors and actions expected of City employees, and outlines the consequences for failure to follow the policies, up to and including termination by the City.

101.    As the Handbook itself states on Page 1, "All employees of the City of Lynchburg … are governed by these employment policies and procedures."

102.    If an employee such as Plaintiff fails to follow the requirements of the Handbook, the City can terminate him.

103.    The Handbook was drafted exclusively by and on behalf of the City, and accordingly must be construed against the City.

104.    Given that the Handbook allows termination for rules violations, and commits the City to certain practices in the interest of its employees, there exist offer, acceptance and consideration such as to constitute a binding contract between Plaintiff and Defendants.

105.    Even should the Court find that the Handbook creates no right to continued employment, it inarguably creates obligations for how Plaintiff and Defendants shall conduct themselves toward one another during the continuance of that employment.

106.    On page 5, the Handbook states, "The City of Lynchburg will make all decisions regarding recruitment, hiring, promotions, reassignments, training and other terms and conditions of employment without unlawful discrimination" (emphasis added).

107.    Yet, in violation of the clear language of the Handbook, Plaintiff was punished for exercising his political expressive rights under the First Amendment, constituting clearly "unlawful discrimination."

108.    The Handbook states, "Allegations of discrimination will be thoroughly investigated and disciplinary or corrective action taken as warranted."

109.    The Handbook states, "City employees are strongly encouraged to report any incident of discrimination or harassment to a supervisor, appropriate Department Director, the City Manager or the Human Resources Department."

110.    Yet the only apparent action taken to Plaintiff's repeated and founded complaints of discriminatory behavior against himself and other fire fighters was the City's retaliatory decision to place a Counseling Report for negative performance in Plaintiff's personnel file.

111.    On Page 7, the Handbook states, "A merit system is one in which selections, appointments and promotions in public service are based on qualifications and competence rather than political favoritism, seniority, or other non-job-related factors. Similarly situated individuals are treated comparably."

112.    Yet Wright and the City clearly breached the contract by discriminating on the basis of political favoritism against Plaintiff for his expressive political statements, done on personal time and in his capacity with the IAFF and not as a Fire Captain with LFD.

113.    In addition, the Department clearly exercised disparate treatment between Plaintiff and the other Fire Captains, in promotion-related training, pay and provision of equipment, in breach of its responsibility to "treat similarly situated individuals comparably."

114.    On Page 98, the Handbook states, "City employees may participate in political activities while they are off duty, out of uniform and not on the premises of their employment with the City."

115.    On Page 99, the Handbook states, "No employee shall use his/her official authority to coerce or attempt to coerce a subordinate employee … or to discriminate against any employee or applicant for employment based on political affiliations or political activities."

116.    The purpose of these policies is stated, on Page 98, as being to "protect[s] every employee's right to vote and to keep this right free from interference, solicitation or dictation by any fellow employee, supervisor or officer."

117.    Yet when Plaintiff dared to express personal support for candidates challenging the party with majority rule on City Council, Deputy Chief Wright and the City breached the contract by retaliating against Plaintiff for exercising his First Amendment right, which was further explicitly protected by the Handbook.

118.    On Page 79, the Handbook states that "performance feedback" shall "[b]e consistent and equitable across the organization." Copies of the relevant pages of the Handbook are attached as Plaintiff's Exhibit 12.

119.    Yet although the City's "Counseling Report" cited actions by [Plaintiff] and your crew," on information and belief, no other crew member except Plaintiff received a "Counseling Report" for the cleanup of the shop room. Again, the City breached its responsibilities under the Handbook.

120.    Accordingly, the City has breached its contract with Plaintiff, and he is entitled to have this Court enforce that contract according to its terms.

## COUNT TWO - VIOLATION OF RIGHT TO FREE SPEECH - 42 U.S.C. § 1983

### (Against all Defendants)

121.    Plaintiff hereby incorporates by reference Paragraphs 1 to 120  as if fully restated herein.

122.    Defendants' action to retaliate against Plaintiff for expressing his personal views, on personal time, on matters of public concern, offends the First Amendment to the Constitution. (See *Texas v. Johnson*, 491 US 397, 441 (1989) "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

123.    Code of Virginia § 15.2-1512.2(B) states,

> no locality shall prohibit an employee of the locality, including firefighters, emergency medical services personnel, or law-enforcement officers within its employment, or deputies, appointees, and employees of local constitutional officers as defined in § 15.2-1600, from participating in political activities while these employees are off duty, out of uniform and not on the premises of their employment with the locality.

124.    Section (C) of the same statute states,

> For purposes of this section, the term "political activities" includes, but is not limited to, voting; registering to vote; soliciting votes or endorsements on behalf of a political candidate or political campaign; **expressing opinions, privately or publicly, on political subjects** and candidates; displaying a political picture, sign, sticker, badge, or button; participating in the activities of, or contributing financially to, a political party, candidate, or campaign or an organization that supports a political candidate or campaign; attending or participating in a political convention, caucus, rally, or other political gathering; initiating, circulating, or signing a political petition; engaging in fund-raising activities for any political party, candidate, or campaign; acting as a recorder, watcher, challenger,

or similar officer at the polls on behalf of a political party, candidate, or campaign; or becoming a political candidate (emphasis added).

125.    Political cartoons clearly fall within the protection of the First Amendment. (See H*ustler Magazine v. Falwell*, 485 US 46, 55-56 (1988) ("Despite their sometimes caustic nature, ... graphic depictions and satirical cartoons have played a prominent role in public and political debate. … From the viewpoint of history it is clear that our political discourse would have been considerably poorer without them").

126.    Plaintiff's speech was clearly on a "matter of public concern." (See *Kirby v. City of Elizabeth City, North Carolina*, 388 F. 3d 440, 446 (4th Cir. 2004) "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. ...The public-concern inquiry centers on whether 'the public or the community is likely to be truly concerned with or interested in the particular expression'").

127.    As such, Plaintiff's speech was protected by the First Amendment, which protects him from retaliation by the City or the Department.

128.    The fact that Wormser's letter based the "interrogation" exclusively on "citizen complaints" from individuals who disagreed with Plaintiff's political views, demonstrates that "transgender" bathroom access is indeed a matter of public concern.

129.    Given that Plaintiff's statements were undeniably on matters of public concern, they must be protected. (See *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 US 563, 574 (1968) "statements by public officials on matters of public concern must be

accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors").

130.   Accordingly, the adverse actions taken by Wormser, the Department and the City against Plaintiff were all taken in retaliation for his expression of politically protected speech, in violation of the First Amendment to the Constitution.

131.   Wormser's actions, as an agent of the City and the Department, and on information and belief under instruction from one or more of Dolan, Wright and Wodicka, in requiring Plaintiff to submit to the "interrogation" and attempting to place him under a gag order, were done under color of law, to the injury of Plaintiff's rights.

132.   The actions of Dolan, Wright and Wodicka, in attempting to retaliate against Plaintiff for expressing his deeply held religious views and his political speech were done under color of law, to the injury of Plaintiff's rights.

133.   Accordingly, Plaintiff seeks damages under 42 U.S.C. Section 1983 for the violations of his constitutional rights.

## COUNT THREE - VIOLATION OF FREE EXERCISE OF RELIGION - 42 U.S.C. § 1983

### (Against all Defendants)

134.   Plaintiff hereby incorporates by reference Paragraphs 1 to 133  as if fully restated herein.

135.   The First Amendment likewise protects against government infringement the right to citizens' free exercise of religion.

136.   Plaintiff's February 1 meme expressed his deeply held religious belief that God originally created humankind as male and female, and that this binary creation is immutable, regardless of the belief or desires of any person.

137.   Plaintiff's meme expressed his deeply held religious belief that to treat someone as something other than their biological sex is a sin against God.

138.   Plaintiff's meme was further an attempt to express his religious view to a wider audience.

139.   Defendants' imposition of adverse employment actions was impermissible retaliation for Plaintiff's expression of his religious beliefs (See *Sherbert v. Verner*, 374 U.2. 398, 402 (1963) ("Government may [not] … penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities....").

140.   Because Plaintiff's religious beliefs were expressed in a public forum on a matter of public concern, they are entitled to a heightened level of protection as they involve a "hybrid" of his rights to religious exercise and political speech. (See *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 US 872, 1881 (1990) "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press…").

22

141.    Regardless, Plaintiff's comments on matters of public concerns did not violate any "generally applicable law," as they are in fact protected by the First Amendment's protection of free speech.

142.    Defendants' retaliatory adverse employment actions against Plaintiff damaged Plaintiff in the exercise of his religious freedoms guaranteed to him by the First Amendment to the Constitution.

143.    Accordingly, Defendants' retaliatory actions against Plaintiff are barred by the First Amendment, and Plaintiff seeks damages under 42 U.S.C. Section 1983 for the violations of his constitutional rights.

## COUNT FOUR - VIOLATION OF EQUAL PROTECTION CLAUSE- 42 U.S.C. § 1983

### (Against all Defendants)

144.    Plaintiff hereby incorporates by reference Paragraphs 1 to 143  as if fully restated herein.

145.    Plaintiff's political and religious speech occurred exclusively on personal time, in his personal capacity, and  **out of uniform**, in accordance with the "Employment Policies & Procedures Handbook."

146.    By contrast, Wormser appeared **in full city uniform** at a political rally, in violation of the handbook's command.

23

147.    Yet Defendants ratified Wormser's conduct, and have instigated "investigation," "interrogation" and other adverse employment action against Plaintiff.

148.    Defendants' disparate treatment of Wormser and Plaintiff cannot be explained by anything other than invidious discrimination, between Wormser's beliefs Defendants found "acceptable," and those of Plaintiff, which Defendants plotted to punish.

149.    Black's Law Dictionary defines "invidious" as "arbitrary, irrational, and not reasonably related to a legitimate purpose."

150.    The Fourteenth Amendment bars invidious discrimination on the basis of political beliefs. (See *Williams v. Rhodes*, 393 US 23, 39 (1968) "The Equal Protection Clause ...bans any "invidious discrimination." … That command protects voting rights and political groups as well as economic units, racial communities, and other entities. When "fundamental rights and liberties" are at issue, a State has less leeway in making classifications than when it deals with economic matters" (Douglas, J., concurring)).

151.    Invidious discrimination occurs when the government draws a classification "with an evil eye and an unequal hand." (See *New York City Transit Authority v. Beazer*, 440 U.S. 568, n. 40 (1979).

152.    There is no rational basis for Defendants' disparate treatment of Wormser and Plaintiff, aside from invidious viewpoint-based discrimination for the content of Wormser's speech, and against the content of Plaintiff's speech.

153.    Content-based speech restrictions are presumptively invalid. (See *RAV v. St. Paul*, 505 US 377, 391 (1992) "The First Amendment does not permit [government] to impose special prohibitions on those speakers who express views on disfavored subjects").

154.    By their actions, Defendants have conclusively demonstrated their commitment to advancing speech of one political persuasion, and showing "zero tolerance" for a competing viewpoint.

155.    Defendants' adverse employment actions have damaged Plaintiff by denying him the equal protection of the laws vis a vis Defendant Wormser, constituting invidious discrimination on the basis of Plaintiff's political and religious expression, in violation of the Fourteenth Amendment to the Constitution.

156.    Accordingly, Defendants' retaliatory actions against Plaintiff are barred by the First Amendment, and Plaintiff seeks damages under 42 U.S.C. Section 1983 for the violations of his constitutional rights.

## COUNT FIVE - CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CIVIL RIGHTS - 42 U.S.C. § 1985

### (Against Defendants Dolan, Wright and Wodicka, in their official capacities)

157.    Plaintiff hereby incorporates by reference Paragraphs 1 to 155  as if fully restated herein.

158.    42 U.S.C. Section 1985 states, in relevant part:

> If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws … if one or more persons engaged therein do, or cause to be done, any act in

25

furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

159.     The actions of Defendants Dolan, Wright and Wodicka (collectively "the individual defendants") evince a conspiracy to retaliate against Plaintiff for his expression of his deeply held religious beliefs, and for expressing protected political speech on matters of public concern.

160.     The individual defendants sent multiple emails, to each other and to outside third parties, held meetings and, in the case of Dolan, pressured other City officials to engage in retaliatory adverse employment action against Plaintiff, invidiously discriminating against him based on the viewpoint of his speech.

161.     On January 29, 2021, Dolan wrote to Wodicka, "This [Plaintiff's meme and reposting of cartoons] needs to be addressed! We need to have zero tolerance for this type of activity.... Please let's talk about a meeting to discuss."

162.     On February 4, 2021, Wodicka replied, "Beau [Wright] and I just spent some time talking this over. Maybe you and I can talk about it a little more tomorrow."

163.     Dolan wrote to "citizen complainant" Kittinger, "I am totally in agreement with you and do not support or will not tolerate this type of malicious rhetoric. No question his comments are unconscionable, and City Leadership needs to take action."

164.     On February 3, 2021, Wodicka wrote to "citizen complainant" Staton, "I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the

City intends to create or support… Please understand that this is a personnel matter that will be addressed appropriately…"

165.    On information and belief, between their emails and their meetings, the individual defendants conspired to "address" Plaintiff's exercise of free speech by commencing an "investigation" and requiring Plaintiff to submit to an "interrogation" over his speech.

166.    On information and belief, one or more of the individual defendants caused Wormser to be instructed to initiate the adverse employment actions against Plaintiff, in furtherance of the conspiracy to deny Plaintiff's civil rights.

167.    Wormser followed the instructions, and on March 25, 2021, ordered Plaintiff to submit to an interrogation, and attempted to subject Plaintiff to a gag order.

168.    On information and belief, one or more of the individual defendants caused Wormser to be instructed to impose a gag order on Plaintiff in furtherance of the conspiracy to deny him his civil rights.

169.    On information and belief, the individual defendants were aware that Wormser had appeared at a BLM political protest on July 4, 2020.

170.    Yet, on information and belief,  no defendant sought any adverse employment action against Wormser.

171.    At all relevant times, all three individual defendants actions in furtherance of the conspiracy were taken under color of law.

172.     As a result of the conspiracy, and the adverse employment action perpetrated against Plaintiff by instructions in furtherance of the conspiracy, Plaintiff has been damaged in the exercise of his civil rights.

173.     Accordingly, Plaintiff seeks damages against all three individual defendants, in their official capacities only, for the deprivation of his civil rights.

## REQUEST FOR RELIEF

Accordingly, Plaintiff respectfully prays this Court for the following relief:

1.     An Order granting Plaintiff back pay in the amount of the two-percent pay increase beginning July 7, 2020, with 6 percent (6%) interest as of the date of judgment.

2.     An Order that the Department adjust Plaintiff's payroll taxes and Virginia Retirement System contributions to reflect the two-percent pay increase beginning July 10, 2019.

3.     An Order granting Plaintiff a judgment against all defendants, in their official capacities, for $450,000 for Defendants' violations of his religious and free speech rights under the First Amendment.

4.     An Order that the City provide Plaintiff with a city laptop of like kind and quality as those provided to the other Fire Captains.

5.     An Order that the "Counseling Report," any report stemming from the March 29, 2021 "interrogation," and any references thereto be immediately and permanently removed from Plaintiff's personnel file and destroyed.

6.      An Order that the City implement "whistleblower" protections into its "Employment Policies & Procedures" handbook, to ensure protection of the First Amendment rights of Plaintiff and other employees.

7.      An Order that the City conduct First Amendment training for all employees, ensuring that employees are advised of their rights to make statements on matters of public concern and to express their deeply held religious beliefs, without fear of retaliation by the City.

8.      An Order that the City post notice copies of the "Fraud and Abuse Whistleblower's Protection Act" in all City workplaces, and mandate annual employee training on the employee protections in the Act, to ensure that similar breaches toward Plaintiff and other employees will not continue.

9.      An injunction preventing Defendants from taking any further adverse employment actions against Plaintiff on the basis of the personal political speech he made pursuant to his deeply held religious beliefs, on matters of public concern.

10.     Pursuant to 42 U.S.C. Section 1983, an award of Plaintiff's attorney's fees in this matter.

11.     Such other and further relief as may seem to this honorable Court to be just and reasonable.


                              Respectfully Submitted,

                              Martin Misjuns
                              By Counsel

James D. Fairchild, Esq. (VSB No. 83174)
FAIRCHILD & YODER, PLLC
18264 Forest Rd.
Forest, VA 24551
Phone: 434-846-5470
Fax: 434-385-1319
Email: jd@fypllclaw.com

Rick Boyer, Esq. (VSB No. 80154)
FAIRCHILD & YODER, PLLC
18264 Forest Rd.
Forest, VA 24551
Phone: 434-846-5470
Fax: 434-385-1319
Email: rick@fypllclaw.com



# LYNCHBURG FIRE DEPARTMENT
# COUNSELING FORM

| EMPLOYEE INFORMATION | |
|---|---|
| Print Employee's Name: | Print Counselor's Name: |
| Captain Martin Misjuns | Battalion Chief Allen Carwile |
| 05/03/2020          A Shift – Station 8 | Battalion 2 – A Shift |
| Date                     Shift & Station | Assignment |

## COMMENTS

On March 13, 2020, you and your crew began the removal of furniture, carpeting and cabinetry in the shop side front room of the station. This room had previously been used as a break room for LPD and most recently was used for storage of replacement stretchers for the ambulances. This cleaning was at the request of Captain Jennifer Collins to have the rooms for the new equipment "prepped by everyone ahead of time." (See email dated 2/27/2020)

During your removal of items in the room, the ceiling assembly of 2'x4' tiles and track was removed and the existing light was raised in the room. There is an understanding that the plan was to raise the ceiling so the fitness equipment could be installed correctly in the room. The pull-up bar on the rack could be installed properly and could be used as intended. The additional height would also allow exercises such as barbell shoulder presses and jump roping to be conducted in the room without worrying of hitting the ceiling with the equipment.

On March 16, 2020, Building and Grounds from the City came to the station and removed the furniture and cabinetry that had been removed from the room. They also took the ceiling assembly that had been removed, so the opportunity to reuse the same components to replace the ceiling was lost. You also talked with a member of building and grounds about additional work that needed to be performed both around the station and in this room. You sent an email to Ann Jenkins to create a request for tracking purposes so the work could be performed. You also stated that you had talked to Captain Russell Ayscue about the placement of an extension on the cinder block wall that divides the front room from the shop area. (See e-mail dated March 16, 2020 to Ann Jenkins)

The department appreciates the initiative and effort that you and your crew showed in preparing the room for the new fitness equipment and improvements to the space. Unfortunately, this work has created some issues that need addressing. Approval was not obtained prior to removal of the ceiling. This plan should have been communicated to fire department senior staff, since the removal of the ceiling would encumber funds to replace the ceiling at a new height. While the cost to replace the ceiling assembly and build a partition wall on the existing wall, in order to raise the ceiling height, may be minimal, anytime department funds may be encumbered, the plan and associated costs must be approved by the fire department senior staff due to budgetary concerns.

Removal of the ceiling assembly also created a fire code violation. Ceilings within a structure act as passive fire control measures to reduce the spread of fire within a structure vertically and subsequently horizontally. The absence of the rated ceiling assembly creates a hazard that must be addressed for the safety of the occupants of the building.

Again, I want to thank you and your crew for the effort and work that you put into improving the station to make room for our new fitness equipment. In the future though, please ensure that any work that you perform to the station that may require money to complete is fully communicated to fire administration to ensure budgetary and safety concerns are addressed prior to any work being performed.



# CITY OF LYNCHBURG
## INCIDENT REPORT

### EMPLOYEE INFORMATION

**Date:** 05/03/2020  **Department:** Fire Department  **Division:**

### INCIDENT INFORMATION

**Date of incident:** March 13, 2020  **Time of Incident:** N/A  Select one

**Location of incident:** Fire Station #8, 213 Old Graves Mill Road

**Weather Conditions:** Not Applicable

**Description of incident: (list individual or property involved)** In preparation for the arrival of new fitness equipment for the station, the members of "A" shift, (Captain Martin Misjuns and MFF Colao Lombre) began renovating and cleaning the front room on the shop side of the station. This included removing existing cabinetry, carpet, and furniture. In order for the new equipment to be placed in the room, to be assembled as designed, and to provide additional ceiling height to perform certain excercises, the ceiling was removed allowing the additional height with the expectation of reinstalling the ceiling along with other improvements to the room.

### CLAIMANT                          EMPLOYEE

**Name #:** Not applicable         **Name:** Not applicable

**Address #:**

**Phone# (work):**                 **Department/Division:**

**Phone# (home):**

### OTHER

**Any City Employees Injured:** ☐ Yes ☒ No
(If yes, contact Risk Management and complete Injury Report)

**Claimant Injured:** ☐ Yes ☒ No (If yes, contact Risk Management)

**Claimants Medical Attention:** ☐ Needed  ☐ Requested  ☐ Refused/Declined

**Describe Claimant Injuries (if any):**

**Claimant Property damaged (include who owns the property):**

**City Property damaged:** Fire department employees removed approximatelyf 144 sq. ft. of 2x4 ceiling grid and ceiling tiles that will need to be replaced. Ceiling assembly was taken away by Building and Grounds along with other items from the room on March 16th. A new ceiling will need to be installed to enclose the room and seperate it from the attic space.

### REPORT COMPLETED BY:

Employee Signature_____   Print name_____

Supervisor Signature_____   Print name_____

City of Lynchburg — Department of Risk Management                    ED-2005

| SIGNATURES | |
|---|---|
| **EMPLOYEE** | **SUPERVISOR** |
| Print Name:<br>Martin Misjuns | Print Name<br>Allen Carwile |
| Signature: | Signature: |
| (Your signature confirms you have reviewed this form) | Date: |

CC: Deputy Chief Robert Lipscomb

BC Carwile,

I politely object to this counseling form, and attached incident report. I am also aware that you filled this out under duress. On April 24, 2020, while meeting with you in your office at Fire Station 7, you told me you were displeased with the action of James Lowe, Director of Human Resources for the City of Lynchburg, for directly emailing me a counseling memo without even going through our Department director and supervisory chain-of-command. Additionally, you told me that Deputy Chief Robert Lipscomb ordered you to write this counseling form, and that you, as my first-line supervisor, did not think was necessary because the matter documented in this counseling form had been addressed, by you and I through several conversations, several weeks prior to this counseling form being prepared. You had told me on those discussions multiple times to watch out, because you thought Deputy Chief Jonathan Wright was "on a war path" to get me, and that you implied would do your job to protect me from any unnecessary or unwarranted personnel action.

On Tuesday, April 21st, I reported to you immediately that Deputy Chief Jonathan Wright had crossed the line and I felt like I had been intimidated and bullied while on duty, at the fire Station, after he failed to get the response he personally desired from me while I was off-duty, on April 21, 2020, objecting to a post that was made on the IAFF Local 1146 Facebook page and pressuring me to take it down. His actions as a member of management in the City of Lynchburg were inappropriate in my opinion as a union officer as far as labor-management relations go, but I tolerated it because I was off duty, and I respect his rights to free speech guaranteed by Article I Section 12 of the Bill of Rights in the Virginia Constitution, even though he may have been attempting to violate that same right of IAFF Local 1146 and myself in his actions. He crossed the line, in my opinion, when he permitted himself to act in the manner he did while I was on duty, at the Fire Station, in his official capacity as Deputy Fire Chief and mine as Fire Captain. That is well-documented I the email I have also attached to be included with this counseling form sent to you on April 24, 2020 at 8:51AM. You have since told me that you discussed it with the Fire Chief that day, and documented that interaction with Chief Wormser in an email you sent to me at 6:56AM this morning, although you did not forward my actual email until this morning as well, to the Fire Chief, it is clear that he was aware of this issue prior to our meeting on April 24, 2020.

This leads me to the belief that this counseling form, which will become a part of my personnel record, is retaliatory in nature for my association with and activities with IAFF Local 1146 and the local unions affiliated political action committee. You actually told me on April 24th, that you believed your order to prepare this counseling form may be retaliation for this activity and my association with IAFF Local 1146, as well as my formal complaint against DC Wright. You said in regards to our unions political action efforts that the City of Lynchburg "had never seen anything like this" in local politics. It should be noted that these actions are afforded protection through state and federal law.

Also, you told me you were pressured yesterday by DC Lipscomb to get this completed right away, which I find even more interesting as I engaged off-duty, as someone being interviewed by the press, during a Local 1146 Press Conference expressing that the intimidating and retaliatory management environment in the City of Lynchburg needed to end, in front of a live camera on May 5th, 2020.

As someone who swore an oath to defend the Constitution of the United States as a member of the armed forces and a veteran of foreign war, I find these actions by the Fire Department Senior Staff extremely disturbing, and as someone who swore an oath as a firefighter for the City of Lynchburg to uphold the Constitution of Virginia, I find them equally disturbing. Additionally, I feel as if these actions are disciplinary in nature to discourage, intimidate or coerce the IAFF Local 1146's protected assembly and actions. Counseling is listed in the Employment Policies and Procedures Manual under the Employee Discipline section. The actions of the City of Lynchburg have caused me to seek counseling through the Employee Assistance Program for mental anguish, physical pain, loss of sleep and suffering the actions Fire Department Senior Staff have caused me, as well as members in the Leadership Team in City Hall. I feel like the personnel actions of the City of Lynchburg have been unfairly applied towards me as an effort to intimidate and suppress efforts of our union off duty. I've included this statement with your counseling form as my right to ensure my side of the matter remains permanently attached my personnel record. Thank you for your honest and frank discussion during this matter, and I do not envy the extremely difficulty position you have been placed in.

Respectfully,

Martin J. Misjuns

Captain, Lynchburg Fire Department



*Fire Department*
800 Madison Street • Lynchburg • Virginia • 24504
www.lynchburgva.gov • P 434-455-6340
*Fire Chief's Office*

October 16, 2020

Captain Martin Misjuns
Station 8 – A Shift

Captain Misjuns:

The investigation into the allegations and circumstances surrounding your complaint(s) against Deputy Chief Jonathan Wright is complete.

The allegations you made included the following claims: intimidation in the workplace, creating a hostile work environment, and retaliation. As you are aware, the City retained an independent contractor to investigate the claims and this investigator has determined that all of the allegations you have brought forth are unfounded. It is clear to me however that there are several issues that need to be addressed related to expectations in the workplace.

1. Throughout this investigation, one of recurring themes was poor and ineffective communication.

    a. While your original complaints dealt with intimidation and a hostile work environment, during the investigation a complaint of retaliation was also raised. However, you disregarded the investigator's requests and attempts to schedule interviews with you to address the retaliation claim.

    b. Although you complained to the investigator that you did not receive a city issued laptop in a timely manner, you made no attempt that I am aware of, to communicate with your chain of command or with Fire Administration regarding this matter until April of 2020.

    c. You and I discussed the situation related to the AAIR class after you made mention of a "Deputy Chief who had lied to you." Again in this instance, there was clearly a lack of understanding about the circumstances and the situation.

    d. Your name was not omitted from any promotional memo that I have seen and to my knowledge although you allege that this occurred, there is no supporting evidence. At any rate an omission would have been purely accidental and would have been corrected once it was brought to the attention of staff.

    e. You discussed elements of the investigation with individuals inside and outside of our organization that were not in your chain of command, your union representative, legal counsel, counselor, or minister after you were asked not to do so by the investigator. You were asked not to discuss this matter with others because discussing this matter with other individuals except those assigned investigative responsibility could compromise the integrity of the investigation.

Martin Misjuns

──────────────── A Great Place to Live, Work & Play! ────────────────

October 16, 2020
Page 2

2. While I recognize your position relative to union activities and respect your rights to speak on matters of public concern, you should understand that your behavior with respect to political activities could potentially give rise to violations of the City's policies related to political activity and public speech.

I want to be clear, your assertions and allegations do not constitute intimidation or the creation of a hostile work environment, rather the complaints you have made are generalized workplace grievances that could have been resolved through more effective communication with your supervisor and others in the command staff. While these examples of poor communication are noteworthy, they are not severe enough to warrant disciplinary action. The Captain Job Description and City Policy states that one of your many responsibilities and expectations is; Maintains harmony and discipline among division personnel; ensures adherence to supervisory directives and to the policies, rules and regulations set forth by both the City Management and the Fire Chief. In order to fulfill these responsibilities you must be willing to communicate with others; the concerns you raised regarding the issuance of a laptop computer, the omission of your name from a personnel memo, a belief that your promotion was delayed, and your concern that you were denied an opportunity to participate in a training class could have been avoided or easily resolved through better communication. Finally please understand that baseless allegations are not tolerated in our organization and are in direct conflict with our core values; honesty, integrity, trust, and compassion. I consider this matter and its associated elements closed.

Regards,

Greg Wormser
Fire Chief

—————————————— A Great Place to Live, Work & Play! ——————————————

Ex. 4

 **Martin J. Misjuns**
2h · 🌐                                                          •••

Let's set something straight for the attacks I've been taking from a local activist group...

IN THE BEGINNING, GOD
CREATED ADAM & EVE.
ADAM COULD NEVER BE A MADAM.
EVE COULD NEVER BECOME STEVE.
ANYONE WHO TELLS YOU OTHERWISE
DEFIES THE ONE TRUE GOD.

**THREATENING ANYONE FOR BELIEVING &
SAYING THIS IS MOST LIKELY A HATE CRIME.**

**202**                      **22**
People Reached              Engagements                    **Boost Unavailable**

 4                                          1 Comment  8 Shares

👍 Like            💬 Comment            ↪ Share       ▾

All Comments ▾

 Comment as Martin J. Misjuns        ☺ 📷 GIF 🙂

 **Darlene Vanderhoof**
And Trump supporters are the deplorables... progressive liberals are the real deplorables

Like · Reply · Message  8m

Write a comment...

Ex. 5



**Martin J. Misjuns**
January 26 at 1:19 AM · 🌐

#BidenErasedWomen - Coming to your daughters high school locker room in the near future.

**3,381**
People Reached

**562**
Engagements

**Boost Unavailable**

26

10 Comments  72 Shares

👍 Like       💬 Comment       ↪ Share

All Comments ▾

---

Comment as Martin J. Misjuns

Melissa Moser

Unban Melissa Moser · Message · 1

**Hope Sullivan**
This comment has been hidden

Unban Hope Sullivan · 4h 51m

**Jessie Vida**
This comment has been hidden

Unban Jessie Vida · Message · 1

**Lauren Johnson**
This comment has been hidden

Unban Lauren Johnson · 4h 51m

**Jeff Miller**
This comment has been hidden

Unban Jeff Miller · 4h 51m

**Dean Smith**
Sad

Like · Reply · Message · 5d

**Maile Ann**
This comment has been hidden

Unban Maile Ann · 1

**Cheryl Tyree Cemarillo**
Enlarge and read captions

Like · Reply · Message · 5d

**Nigel Goulding**
This comment has been hidden

Unban Nigel Goulding · 4h 51m

Write a comment...





EX. 6



**Fire Department**
800 Madison Street • Lynchburg • Virginia • 24504
www.lynchburgva.gov • P 434-455-6340

March 25, 2020

Via Hand-delivery and Email
Captain Martin J. Misjuns
213 Old Graves Mill Road
Lynchburg, VA 24502

Captain Martin J. Misjuns:

I am in receipt of multiple complaints filed against you as set forth below:

**Complaint 1** -
A citizen complaint dated January 27, 2021, related to an asserted homophobic meme that she identifies as "hate speech" that " fans the flames of hate crimes among the transgender community."

**Complaint 2** -
A citizen complaint dated January 29, 2021, that the same memes "espouse hate to individuals and groups in our community" which makes it "very difficult to believe that h[h]e would perform with integrity to save the lives or property of those he so publicly shames" and questions how the public can "trust him to carry out his duties in an unbiased manner."

**Complaint 3:**
**Katie Snyder** -
A citizen complaint dated January 29, 2021, related to that same post that the citizen identifies as "hateful, transphobic," "vile and extremely hurtful." The citizen raises concerns that you, as a leader in the fire department, teach, train, and mentor newer firefighters.

**Complaint 4:**
**Jen Staton** -
A citizen complaint dated January 29, 2021, from a citizen who identifies as "the mom of a member of the LGBTQ+ community" who raises concerns as to whether her family will be safe and states that the "transphobic post" on your Facebook page has caused "damage to the public's trust in our fire and EMS department." A second complaint dated February 3, 2021, from the same citizen in which she further complains that "discriminatory posts on social media should not be tolerated from city employees. Unfortunately, because of that post, every trans person who lives in the Miller Park service area now has to fear that they will not be treated with respect and dignity if they have an emergency situation."

**Complaint 5:**
**Megan Huffman** -
A citizen complaint dated January 31, 2021, related to those same memes, which the citizen identifies as "hate speech" and a "gross misrepresentation of friends of mine in the trans community."

**Complaint 6:**
**Kelsey Moleseed** -
A citizen complaint dated January 31, 2021, and a second complaint from the same citizen dated February 3, 2021, related to what she identifies as "an extremely bigoted post" on your "public figure page" which is "full of angry and hateful posts." In her first complaint, the citizen states that she is "writing out of concern for the safety of our community. No one should feel unsafe calling the fire department, but that's not fully possible while one of its members publicly spouts so much anger and hatred every day." In her second complaint, she writes that the "hateful posts" on your "public figure page" "display clear transphobia and homophobia, as well as anger at people with different political beliefs." She asserts that your posts are "not speaking there as an individual but as a member of the

———————————— **A Great Place to Live, Work & Play!** ————————————

fire department" and raises concern that "the fire department endorses the kind of hatred displayed." She further complains that your posts are "a public safety issue. No one should be afraid to call 911, but that's not fully possible while Mr. Misjuns' posts remain on his public figure page... Mr. Misjuns' use of his position to spread unabashed hatred is hurtful..."

**Complaint 7:**
**ara Beck**

A citizen complaint dated February 1, 2021, related to the same memes, which the citizen identifies as "hateful, transphobic images" that are "reminiscent of the type of explicitly racist cartoons from the Jim Crow era" that "demeaned Blacks and legitimized violence against them. Likewise, the cartoon posted by Mr. Misjuns not only demeans transgender individuals, but creates a hostile and dangerous environment for those individuals and their families in our community." The citizen questions whether posting the "bigoted caricature" is the "hostility" that "the Lynchburg City Fire Department hopes to promote."

**Complaint 8**

A citizen complaint dated February 3, 2021, identified as an "urgent concern" related to "transphobic Facebook posts," stating, "I have good friends who are trans, and these posts deeply disturb them and me."

**Complaint 9:**
**en Staton**

A citizen complaint dated February 3, 2021, in which the citizen requested that the City review your Facebook posts, which are described as "dangerous" rhetoric for the LGBTQ+ community and other marginalized communities, to ensure that they do not violate Chapter 7, Section XIII of the City's personnel manual. This citizen raised concerns that your statements would impact how they hire City employees to work their public events.

**Complaint 10:**
**en Staton?**

A concern reported related to a Facebook post dated January 7, 2021, related to the Capitol riot on January 6, 2021, in which you use the following language: "opportunist thugs as Black Lives Matter protestors" and the "CCP Virus pandemic," which is seen as potentially racist towards members of the Black and Asian communities.

**Complaint 11:**
**legan Huffman**

A citizen complaint dated February 9, 2021, in which the citizen requested disciplinary action against you for your public statements, which she identified as "dehumanizing conduct," and requested a public statement from the City expressing a no-tolerance policy on hate speech, employee education on tolerance, hate speech, and social media conduct, and a town hall or community learning opportunity to openly discuss racism, homophobia, transphobia, and hate speech.

**Complaint 12:**
**nonymous Source**

A complaint from a concerned citizen dated February 26, 2021, related to what is identified as "concerning bit of dialogue" between you and another firefighter. The citizen notes that in your posts you do not speak highly of your employer and are sabotaging hiring efforts. In one post, your fellow firefighter states that someone in medic school, working for another agency directly informed him that he did not wish to work at the City, asking "who you were and what your problem was." Based on what is described as your "temper," based on your interactions and other posts you make, the citizen wishes to remain anonymous but attached the posts in question to the complaint. Similar concerns about these communications were raised directly with the Fire Administration by members of the fire department.

**Complaint 13:**
**Petition Screenshots**

Statements taken from an online petition that you circulated related to Maryjane Dolan as follows:

  o  "Mayor Dolan recently used her office to intimidate me, a first responder in our city who is also a city employee, for publicly standing up for our women and children after I was harassed by a local RADICAL LGBTQ+ Activist Group with fruitless and unfounded attempts to have me 'cancelled' by the City of Lynchburg."
  o  References to Lynchburg City residents as "radical activists"
  o  References to Ms. Dolan as "spineless"

o "A local RADICAL LGBTQ+ Activist Group, Hill City Pride, who wishes for transgender and transitioning individuals to enter the public restrooms of their choice based on the gender they identify with, rather than the gender God made them as a at birth attacked me for bringing awareness to the dangers of allowing public restroom use, particularly in our schools, based on gender identity. *I believe public policy that would allow this would also permit easy access for predators into the public restrooms our women and children use, and poses unnecessary risk in to them in our schools and other public places.*"

o "She DEMANDED ACTION from city staff in order to satisfy the far-left activist group stating that I intended to do harm to the transgender community with my speech – and this intimidation violates my rights."

| Complaint 14: Petition Auto Email | - | An email you sent on March 16, 2021, to the City Council and City Manager, in which you assert that your rights as an employee were violated and in which you referred to members of the LGBTQ+ community as "fanatical activists that want to impose radical views on our community that the vast majority of city residents do not believe in." |

The general concern raised in these complaints is that your behavior demonstrates a personal bias against certain Lynchburg City residents, which renders you unfit to serve as a leader in the Lynchburg City fire department.

I will be conducting an investigation into this matter and whether your conduct violates City policies. I will conduct your initial interview on **Monday, March 29, 2021, at 9:00 AM** at the Fire Administration Building.

You are responsible for truthfully answering questions and providing requested information. You are ordered not to discuss this matter in any manner with anyone other than; your religious leader, your counselor, your immediate chain of command, your observer (who must also not discuss this matter with anyone else), and those assigned to conduct this investigation (whose names will be provided by me, to you, in advance) until the investigation is completed. You are to remain available for interview purposes at all times during this investigation.

This investigation will be conducted in a fair and impartial manner and will be limited to the allegations cited in the complaints. You may have an observer of your choice present during the interview. Pursuant to Virginia law, your observer may not participate in the interview or represent you, may not be involved in the investigation, and must be an active or retired member of the department, for purposes of confidentiality.

You are advised to review the City of Lynchburg Policies and Procedures as well as the Firefighters Procedural Guarantee Act, Va. Code § 9.1-300, et. seq., commonly known as the Firefighter Bill of Rights, which provides information regarding the investigation procedures, as well as your rights and responsibilities. A copy of the Firefighters Procedural Guarantee Act is being provided to you for your convenience.

Should you have any questions or concerns regarding this investigation, please let me know.

Sincerely,

Greg Wormser; Fire Chief

A Great Place to Live, Work & Play!

Ex.7

https://www.vpap.org/donors/85403-mary-jane-tousignant-dolan/?start_year=all&end_year=all

# Mary Jane Tousignant-Dolan

**Donor**

- Industry: Stockbrokers/Financial Advisors
- Employer: Colonial Brokerage
- Location: Lynchburg, VA

All Years ⌄ | All Candidates and Committees ⌄

## Contribution(s) Totalling $20,408 ⓘ

Democratic | ████████████████ $18,958
Republican | ▌ $1,450
Other | $0

METHODOLOGY: Donations on this page are reported by the recipient.

All | Republican | Democrat | Other

| Amount | Committee |
|--------|-----------|
| $7,000 | Valentine for Delegate - Shannon |
| $6,438 | Dodson for Senate - Bert |
| $2,000 | Clarke for Senate - Robert |
| $1,020 | Democratic Party - Lynchburg |
| $700 | Cyphert for Delegate - Katie |
| $500 | Deeds for Governor - Creigh |
| $500 | Herring for Attorney General - Mark |
| $500 | Lynchburg First |



| Amount | Committee |
| --- | --- |
| $7,000 | Valentine for Delegate - Shannon |
| $6,438 | Dodson for Senate - Bert |
| $2,000 | Clarke for Senate - Robert |
| $1,020 | Democratic Party - Lynchburg |
| $700 | Cyphert for Delegate - Katie |
| $500 | Deeds for Governor - Creigh |
| $500 | Herring for Attorney General - Mark |
| $500 | Lynchburg First |
| $250 | Gillette for Lynchburg City Council - Mike |
| $250 | Mason for Lynchburg City Council - Charleta |
| $250 | Northam for Governor - Ralph |
| $250 | Woofter for Delegate - Jennifer |
| $150 | Foster for Lynchburg City Council - Joan |
| $150 | Swisher for Lynchburg Clerk of Court - Kenneth |
| $150 | Tweedy for Lynchburg City Council - Treney |
| $150 | Virginia First |
| $150 | Wagner for Lt Governor - Jody |

$Ex.8$

 **Gmail**

Rick Boyer <rick@fypllclaw.com>

---

**(no subject)**
1 message

---

**Rick Boyer** <rickboyerlaw@gmail.com>                    Tue, Mar 30, 2021 at 4:22 PM
To: rick@fypllclaw.com

---

From : "Tousignant Dolan, Maryjane" <MaryJane.Dolan@lynchburgva.gov>
To : reid.wodicka@lynchburgva.gov;
Date : Fri Jan 29 19:48:19 EST 2021
Subject :Fw: Transphobia in Fire Department
Reid,

This needs to be addressed!  We need to have zero tolerance for this type of activity on the part of
City employees. I know that this is not the first time that this person has displayed questionable if
not unconscionable rhetorical post on his social media platforms.  If we are in fact to be a City that
has values of diversity, equity and inclusion, we need to address this type of behavior.  Please
let's talk about a meeting to discuss.

MaryJane

**COMPLAINT 4**

From : "jennifer staton" <jlstaton@msn.com>
To : reid.wodicka@lynchburgva.gov;
Date : Wed Feb 03 18:15:18 EST 2021
Subject :Re: No room for hate in the hill city

ï»¿

Hi Reid,

I just want to point out that at the time of the posting it was not on a personal page or a âpersonal blog.â Mr. Misjuns created a âpublic figureâ page and in the bio for that page he listed â public servant. â since then he has changed the classification of the page from âpublic figureâ to âpersonal blog.â  At the time of the posting it wasnât a private or personal page though. He was posting as a public figure who represents the city of Lynchburg.

Personal page or not, discriminatory posts on social media should not be tolerated from city employees. Unfortunately, because of that post, every trans person who lives in the Miller Park service area now has to fear that they will not be treated with respect and dignity if they have an emergency situation.

Thanks,

Jen

Sent from my iPhone

ï»¿Good afternoon,

Thank you for your email, I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the City intends to create or support. We are an inclusive community and we, as an organization, are called to respect differences among the diverse members of our community. It is regrettable that a posting on a personal social media page by a member of the City organization has led members of our community to question the commitment of their local government to provide services â particularly in a field as critical as Fire and Emergency Medical Services. As an organization, we exist to serve everyone in our community, to meet their individual needs, and I agree that we should always strive to create an inclusive, welcoming environment. I can assure you that at no time will anyone receive a substandard level of service as a result of their individual characteristics â and if that were to ever occur, it would be investigated and corrected. While I recognize that this post may have called this into question, please know that there are many, many dedicated professionals in our organization that continually reaffirm that commitment each and every day. I do sincerely apologize on behalf of the organization for how I know this must have made some in our community feel.

With respect to Mr. Misjuns and this incident in particular, I have received your concerns. Please understand that this is a personnel matter that will be addressed appropriately in compliance of the

**COMPLAINT 4**

ï»¿Good afternoon,

Thank you for your email. I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the City intends to create or support. We are an inclusive community and we, as an organization, are called to respect differences among the diverse members of our community. It is regrettable that a posting on a personal social media page by a member of the City organization has led members of our community to question the commitment of their local government to provide services â particularly in a field as critical as Fire and Emergency Medical Services. As an organization, we exist to serve everyone in our community, to meet their individual needs, and I agree that we should always strive to create an inclusive, welcoming environment. I can assure you that at no time will anyone receive a substandard level of service as a result of their individual characteristics â and if that were to ever occur, it would be investigated and corrected. While I recognize that this post may have called this into question, please know that there are many, many dedicated professionals in our organization that continually reaffirm that commitment each and every day. I do sincerely apologize on behalf of the organization for how I know this must have made some in our community feel.

With respect to Mr. Misjuns incident in particular, I have received your concerns. Please understand that this is a personnel matter that will be addressed appropriately in compliance of the Cityâs policies, as well as other requirements of the law. It is the Cityâs policy not to discuss personnel matters in public and therefore, I will not discuss any personnel issues related to this or any other matter.

Sincerely,

Reid Wodicka


Reid A. Wodicka, PhD
Interim City Manager
Lynchburg, Virginia
434-455-3990

-----Original Message-----
From: jennifer staton [mailto:jlstaton@msn.com]
Sent: Friday, January 29, 2021 7:58 PM
To: Wright, Beau; Helgeson, Jeff - External; Nelson, Randy; Tweedy, Treney; Wilder, Sterling; Faraldi, Chris; Wodicka, Reid; Hughes, John; Wormser, Gregory; Tousignant Dolan, Maryjane
Subject: No room for hate in the hill city

CAUTION: External Sender


Dear Council Members, City Managers, and Chief Wormser,

Please add my name to the list of Lynchburg City residents that are disheartened and concerned by Captain Misjuns transphobic post on his âpublic figureâ Facebook page. As the mom of a member of the LGBTQ+ community, posts like that one from someone who my tax dollars are paying to keep my family safe are incredibly concerning. I hope that Lynchburg leaders fully understand how much damage this has to the publicâs trust in our fire and EMS department and will take this very seriously.

Ex. 10

 Gmail

Rick Boyer <rick@fypllclaw.com>

## (no subject)
1 message

**Rick Boyer** <rickboyerlaw@gmail.com>                                    Tue, Mar 30, 2021 at 4:23 PM
To: rick@fypllclaw.com

> **From:** Wodicka, Reid <reid.wodicka@ lynchburgva.gov>
> **Sent:** Thursday, February 4, 2021 5:25 PM
> **To:** Wright, Beau <beau.wright@ lynchburgva.gov>; Tousignant Dolan, Maryjane
> <MaryJane.Dolan@ lynchburgva.gov>
> **Subject:** RE: Marty Misjuns must be held accountable
>
>
> Hi everyone,
>
>
> MaryJane: Beau and I just spent some time talking this over. Maybe you and I can talk about it a little more
> tomorrow.
>
>
>
> Thanks,
>
> Reid

Ex. 10

 Gmail                               Rick Boyer <rick@fypllclaw.com>

## (no subject)
1 message

**Rick Boyer** <rickboyerlaw@gmail.com>                    Tue, Mar 30, 2021 at 4:23 PM
To: rick@fypllclaw.com

> **From:** Wodicka, Reid <reid.wodicka@ lynchburgva.gov>
> **Sent:** Thursday, February 4, 2021 5:25 PM
> **To:** Wright, Beau <beau.wright@ lynchburgva.gov>; Tousignant Dolan, Maryjane
> <MaryJane.Dolan@ lynchburgva.gov>
> **Subject:** RE: Marty Misjuns must be held accountable
>
> Hi everyone,
>
> MaryJane: Beau and I just spent some time talking this over. Maybe you and I can talk about it a little more
> tomorrow.
>
> Thanks,
>
> Reid



**Grace Robbins** at **Lynchburg, Virginia**
2 hrs ·

 6

 Like

 Share

EX. 42

# 1 | Introduction

## I. General Information

**A.** This document contains the employment policies and procedures that provide guidance to effectively manage human resources within the City of Lynchburg. While no set of written policies can include every possible situation, these policies, when used as a whole, provide effective guidance and sufficient flexibility to allow independent judgment while ensuring accountability to the public and consistent, equitable decision making.

**B.** The Director of Human Resources develops policy recommendations and the procedures necessary for implementation of policy and serves as a source of expertise on the intent and application of the City's Employment Policies. In cases where several policies apply to the same situation, or where conflicts appear to exist, the City Manager and/or Director of Human Resources are authorized to make a determination as to the intent and application. The City Manager has final authority for the approval and administration of employment policies and procedures.

**C.** All employees of the City of Lynchburg, i.e., persons who perform work for the City in return for financial compensation, except independent contractors and elected officials are governed by these employment policies and procedures. An employee working for a Constitutional Officer is considered a Constitutional employee and may be covered by some or all of the City of Lynchburg Employment Policies by Memorandum of Understanding between the City and the Constitutional Officer.

**D.** The City Manager may make exceptions to the policies in special or unusual situations when in his or her opinion an exception would be in the best interest of the City. Exceptions are documented and maintained by the Human Resources Department. No member of the City administration, other than the City Manager, has the authority to modify any of the terms or provisions of these "Employment Policies and Procedures."

**E.** Policies take effect on the date of City Council and/or City Manager approval, as appropriate, and shall supersede all previously issued policies. Policies and procedures are issued and maintained by the Director of Human Resources. When changes to policies and procedures are approved, information regarding changes will be communicated to the workforce. The Human Resources Department will fully implement all provisions of the policies in a timely and reasonable manner.

# 2 | Employment

## I. Equal Opportunity Employment Policy

The City of Lynchburg is an Equal Opportunity Employer (EOE) and is fully committed to the principles and practices of equal employment. The City maintains and promotes equal opportunity for all employees and applicants for employment in accordance with relevant State and Federal laws. The City will not discriminate on the basis of race, color, religion, sex, national origin, age, physical or mental disability unrelated to the ability to perform the essential functions of the position. The City of Lynchburg will make all decisions regarding recruitment, hiring, promotions, reassignments, training and other terms and conditions of employment without unlawful discrimination.

**A.** The City of Lynchburg will not tolerate any form of discrimination, including sexual or racial harassment, of its employees. Allegations of discrimination will be thoroughly investigated and disciplinary or corrective action taken as warranted. Reprisals against employees who file complaints of discrimination are prohibited; however, such protection does not condone unfounded or vindictive accusations of others. While a guarantee of confidentiality cannot be provided, the City protects the legitimate interests of all parties concerned in a dispute involving allegations of discrimination. *(Please see Chapter Seven, "Workplace Expectations and Procedures" for more information)*

**B.** Reporting Guidelines: Individuals, who feel they have been subjected to discrimination including sexual harassment, are strongly encouraged to respond by using any or all of the following procedures:

1. Contact the Human Resources Department, the City Attorney's office, or a counselor at the Employee Assistance Program to report or discuss situations of potential discrimination or harassment. Every precaution will be taken to ensure confidentiality at this informal, information gathering stage.

2. City employees are strongly encouraged to report any incident of discrimination or harassment to a supervisor, appropriate Department Director, the City Manager or the Human Resources Department. Supervisors, Department Directors or other officials will immediately investigate any report of or act of discrimination of which they become aware.

**G.** External Communication:

    1. The City's job vacancies will be posted on the City's website and related job sites and may be sent to recruitment firms, groups and interested organizations, including minority based groups, informing them of available City positions and the City's EOE Policy.

    2. The Human Resources Department may communicate with representative educational institutions, including vocational schools, for purposes of recruitment.

    3. Upon request, copies of the City's EOE Policy and Diversity and Inclusion Plan will be provided.

**H.** Assignment and Responsibilities for the Diversity and Inclusion Plan:

    1. General Responsibility: All employees are expected to contribute to maintaining a respectful and inclusive workplace. The actions of every employee are important to achieve workforce goals.

    2. Management: Managerial and supervisory personnel are responsible for supporting and maintaining a respectful, inclusive and non-discriminatory environment. Management decisions including those regarding hiring, promotion, working conditions, job assignments, training programs and opportunities for serving on employee committees and project teams shall be based on job-related factors. Supervisory personnel are the primary source of information and appropriate support for employees under their direct supervision concerning the EOE Policy and Diversity and Inclusion Plan.

## III. Merit Principles and Selection

**A.** A merit system is one in which selections, appointments and promotions in public service are based on qualifications and competence rather than political favoritism, seniority or other non-job-related factors. Similarly situated individuals are treated comparably. The City supports merit system principles for all employment actions including selection, promotion and reassignment.

**B.** Initial selection to full and part-time positions as well as promotion to higher level full and part-time positions shall be based upon open competition. Employees are encouraged to apply for positions in which they are interested and qualified. City employees will be given serious consideration for vacancies based upon the relevant qualifications necessary for the position sought.

**C.** Hourly Employment: Applicants for hourly positions, as defined in Section V, A. 3, may be selected and/or appointed without regard to the competitive provisions of this policy including the recruitment procedures.

3. **Gifts and Favors.** No employee shall accept any gift or favor, whether in the form of service, loan, thing, or promise, from any person, firm, or corporation, intended to, or which may, influence him/her in the discharge of his/her duties.

4. **Representing Private Interests Before City Agencies or Courts.** No employee shall represent his/her own or any other private interest before any agency of the City, unless he/she is doing so as a member of a civic organization or is speaking on an issue of general public interest.

## H. Political Activity

1. City employees may participate in political activities while they are off duty, out of uniform and not on the premises of their employment with the City.

2. For the purpose of this policy, the term "political activities" includes, but is not limited to: "voting; registering to vote; soliciting votes or endorsements on behalf of a political candidate or political campaign; expressing opinions, privately or publicly, on political subjects and candidates; displaying a political picture, sign, sticker, badge or button; participating in the activities of or contributing financially to, a political party, candidate or campaign or an organization that supports a political candidate or campaign; attending or participating in a political convention, caucus, rally or other political gathering; initiating, circulating or signing a political petition; engaging in fund-raising activities for any political party, candidate or campaign; acting as a recorder, watcher, challenger or similar officer at the polls on behalf of a political party, candidate or campaign; or becoming a political candidate." (VA State Code Title 15.2-1512.2)

3. The components of this section are designed to promote public trust and confidence in City government by ensuring that it is free of the actual or apparent influence of partisan politics and that employment and advancement in the City are based on meritorious performance rather than political service or affiliation. In addition, it protects every employee's right to vote and to keep this right free from interference, solicitation or dictation by any fellow employee, supervisor or officer.

4. Every employee is encouraged to vote in every appropriate election. Moreover, except during working hours or when officially representing the City of Lynchburg, any municipal employee is free to express his or her opinion as to candidates or issues and to meet with candidates for office.

5. Employees may be candidates for political office but must resign, or shall be released, from employment with the City upon successful election to political office within the City of Lynchburg or other political office if the responsibilities of that office will interfere with the employee's ability to perform the duties of his/her City position.

Workplace Expectations and Procedures

6. Under no circumstances shall an employee engage in political activities while performing the official duties of his/her City position, use any City property or equipment to engage in political activity or to appear as a candidate while dressed in City uniforms or clothing that identifies the individual as a City employee. This prohibition shall not apply to an employee registering to vote or voting.

7. No employee shall use the prestige of his/her position on behalf of any political organization or party. For purposes of this Code of Conduct, a "political organization" shall be defined as "any group, formal or informal, which endorses candidates for elective office at any level of government–national, state or local."

8. No employee shall use his/her official authority to coerce or attempt to coerce a subordinate employee to pay, lend or contribute anything of value to a political party, candidate or campaign, or to discriminate against any employee or applicant for employment based on political affiliations or political activities.

9. City employees are prohibited from discriminating in the provision of City services or responding to requests for services, on the basis of the political affiliations or political activities of the person or organization for which such services are provided or requested.

10. City employees are prohibited from suggesting or implying that the City has officially endorsed a political party, candidate or campaign.

## II. Freedom of Information Act (FOIA)

A. One of the precepts of good government is openness and transparency to constituents. Citizens have a right to information regarding government operations and government employees have a fundamental responsibility to respond to requests for information. Beyond legal requirements, City employees are expected to be ready and willing to help citizens understand what we do and how we do it as we serve the community. This helps build trust with those we serve. City employees are responsible for sharing information about City operations with interested individuals. The starting point is to positively and completely respond to any request for information.

B. Information will only be withheld for valid, legally allowable or required reasons that are stipulated in the FOIA or other statutes. Citizens and others requesting information or copies of public records are not normally charged for the time and materials that it takes to respond to routine requests for information.

C. FOIA applies to public records, typically documents, but also to emails, databases, texts, etc.

Workplace Expectations and Procedures

3. To help employees improve in their current jobs;

4. To help employees develop the knowledge, skills and abilities to be competitive for higher level positions;

5. To recognize overall work performance by employees.

**B.** Performance Feedback

Successful performance feedback relies on an effective partnership between employees and supervisors, strong working relationships and a clear understanding of the expectations of each job. Effective performance feedback will:

1. Be job oriented, providing an evaluation of performance against specific standards, goals and objectives that are related to realistic workplace practices;

2. Promote employees' job satisfaction and morale by letting them know that supervisors are interested in their progress and development as well as providing regular feedback;

3. Provide meaningful information to employees so that employees clearly understand the job functions in which they are meeting or exceeding expectations as well as those they may need to improve;

4. Be consistent and equitable across the organization;

5. Provide a reasonable, objective assessment of sustained performance;

6. Include goals that are specific, measurable, achievable, realistic and timely (SMART).

**C.** Performance Feedback Summary

The formal performance review summarizes the feedback provided throughout the fiscal year. It is based on comparing employee results and action to City values, overall competencies and the specific tasks and expectations of the employee's job. The following procedures will be used to complete a formal, annual summary of performance feedback:

1. A formal, written summary and a face-to-face performance discussion shall be completed at least annually. Frequent discussion and feedback are encouraged.

2. Supervisors and employees must become familiar with the feedback tool including City valued behaviors, relevant core competencies and job specific responsibilities.