CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

**4/20/2023**
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA

### LYNCHBURG DIVISION

| | |
|---|---|
| MARTIN J. MISJUNS, | |
| *Plaintiff*, | CASE NO. 6:21-cv-25 |
| v. | |
| | MEMORANDUM OPINION |
| LYNCHBURG FIRE DEPARTMENT, *et al.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This case comes before the Court on Defendants' motion to dismiss, Dkt. 25. Plaintiff Martin Misjuns argues that Defendants breached his contract and conspired to deprive him of his constitutional rights. He contends that he was subjected to a pattern of intimidation and harassment by the Lynchburg Fire Department's superior officers and was arbitrarily and capriciously denied training necessary to be promoted within the Department. Further, he asserts that Defendants conspired to subject him to adverse employment actions because of his political and religious speech. For the following reasons, Plaintiff's First Amendment claims will survive, while his other claims will be dismissed.

## I.       Background

The following facts are alleged in Plaintiff's Complaint and assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

Defendant Lynchburg Fire Department ("LFD") employed Plaintiff as a Fire Captain. Dkt. 24 ("Amend. Compl.") ¶ 10. Gregory Wormser, an agent of LFD and the City of Lynchburg

1

("the City"), is LFD's Fire Chief and Senior officer. *Id.* ¶ 11. He acts under color of law in his duties as Fire Chief. *Id.* Jonathan Wright and Robert Lipscomb are Deputy Chiefs who serve under Chief Wormser. *Id.* ¶ 12. Next in the chain of command are the Battalion Chiefs: Danny Williams, Allen Carwile, and Sean Regan. *Id.* ¶ 13. The Fire Captains, including Plaintiff Misjuns, follow the Battalion Chiefs in the chain of command. *Id.* ¶ 14. Plaintiff also serves as "an official with IAFF Local 1146, the Lynchburg chapter of the International Association of Fire Fighters," where he is responsible for "bringing complaints of alleged wrongful employment practices from individual union members to the attention of LFD." *Id.* ¶¶ 15–16. Defendant Dolan served as Mayor, Defendant Beau Wright served as Vice-Mayor, and Defendant Wodicka served as City Manager at all relevant times. *Id.* ¶ 17.

### A.  Allegations Regarding LFD's Discriminatory Training and Promotion Practices

Hoping for a promotion to Battalion Chief, Plaintiff continued his education within LFD, and "Fire Officer II [] training was the only class needed for Plaintiff to meet the requirements for promotion to Battalion Chief upon reaching the time in grade requirement." *Id.* ¶ 18. Deputy Chief Lipscomb, on May 20, 2019, issued a memorandum regarding 28 LFD fire fighters receiving promotions. *Id.* ¶ 19. It did not include Plaintiff. However, when Plaintiff spoke to Battalion Chief Regan about the omission, "Regan confirmed that the promotion was … pending." *Id.* ¶ 20. In June 2019, Plaintiff met informally with Fire Chief Wormser and Deputy Chief Wright to discuss his promotion to Fire Captain. *Id.* ¶ 21. "Plaintiff asked to be promoted in time for the upcoming two-percent general City-wide wage increase to be applied to the higher rate of pay he would receive as Fire Captain." *Id.* ¶ 22. Though Wormser responded that he "would always do everything to put the most money in our people's pockets," Plaintiff did not benefit from the two-percent wage increase, as he "was not promoted to Fire Captain until after

the general two-percent wage increase was received." *Id.* ¶¶ 23–24. After "repeatedly follow[ing]

up on the issue," Plaintiff spoke with Wormser again on November 5, 2019. *Id.* ¶ 25. Wormser

informed Plaintiff that "he was continuing to work on the pay increase, and that it had not come

through because Human Resources thought Plaintiff was making too much money." *Id.* ¶ 26.

During this same period, multiple fire fighters addressed Plaintiff in his IAFF capacity,

"alleging bias in the selection of fire fighters for trainings required for promotions." *Id.* ¶ 27.

And Plaintiff, using his IAFF email address, emailed LFD leadership on December 24, 2019,

raising union members' complaints. *Id.* ¶ 28. "Several members alleged unequal Department

practices in offering training opportunities, which were required for promotion within the

Department, to some firefighters and not others." *Id.* Seeking more information related to the

bias allegations in training selection, Plaintiff also filed a Freedom of Information Act ("FOIA")

request with LFD. *Id.* ¶ 29.[1]

Battalion Chief Williams replied on December 30, but instead of sending his reply to

Plaintiff's private IAFF address, he sent it to Plaintiff's LFD email address. *Id.* ¶ 31. Plaintiff

alleges that "[t]he reply was evasive and did not include all documents responsive to the FOIA

request." *Id.* On January 1, 2020, Plaintiff replied, telling Williams that his email was

incomplete, "and that Williams' decision to respond to Plaintiff as a subordinate in the

Department when the request had been made on behalf of the IAFF appeared to be intended to

intimidate Plaintiff for exercising his union responsibilities." *Id.* ¶ 32.

On January 2, 2020, Battalion Chief Williams sent an email listing firefighters approved

for Fire Officer II training, but Plaintiff's name was not on the list, though he had applied for the

---

[1] At the time, Plaintiff was seeking approval to take the training necessary for a
promotion to Battalion Chief. *Id.* ¶ 30.

training. *Id.* ¶ 33. Plaintiff spoke to his immediate supervisor on January 7, 2020, asking why he was not included in the Fire Officer II training, and his supervisor promised to investigate the situation. *Id.* ¶ 34. On January 23, Plaintiff told Williams "his belief that the omission appeared to be intimidation in response to Plaintiff's work on behalf of the union," and asked him why he was not included in the Fire Officer II training. *Id.* ¶ 35. "Plaintiff also reminded Williams of the promise from Fire Chief Wormser that he would be promoted in time to receive the two-percent increase, but he was not." *Id.* ¶ 36.

When the class occurred on January 24, Fire Chief Wormser and Deputy Chief Wright asked IAFF Local 1146 President Jamie Maxwell, who was attending the training, where Plaintiff was. *Id.* ¶ 39. Plaintiff was home because he had not been approved for the training. *Id.* ¶ 37. On January 25, "Wormser called Plaintiff and stated that he 'thought everything had been worked out' and advised that the Department would engage an instructor to provide the class one-on-one." *Id.* ¶ 41. Though the Department eventually engaged an instructor for one-on-one training, "the missed session had to be made up before the next session was scheduled," and the Plaintiff could not obtain child care on such short notice to complete the missed session prior to the next scheduled session. *Id.* ¶ 42. As of the time Plaintiff filed his Amended Complaint, "the Department ha[d] not provided the class." *Id.* ¶ 43. Plaintiff asserts on information and belief that LFD already provided the training class to all other fire captains who submitted a request to take the class. *Id.* ¶ 44. LFD has never explained why Plaintiff faced disparate treatment compared to the other Fire Captains. *Id.* ¶ 49.[2]

---

[2] LFD also gave all other Fire Captains a laptop computer. *Id.* ¶ 45. But when Plaintiff asked Deputy Chief Wright on July 5, 2019 how to get a laptop, Wright responded: "You're the Captain now, you tell me." *Id.* ¶ 46. Despite Plaintiff repeatedly following up about the laptop situation, "most recently by submitting a trouble ticket through the Department of Information Technology on March 3, 2020," LFD continues to refuse to issue a laptop to Plaintiff, "and

**B. Allegations Regarding Defendants' Retaliation for Plaintiff's Expression of Speech and Religion**

Also, IAFF Local 1146 decided in the spring of 2020 to support Lynchburg City Council candidates affiliated with the Republican Party, who were running "against candidates supported by the Democrat majority on City Council, which majority includes Dolan and [Vice-Mayor] Wright." *Id.* ¶ 51. "Plaintiff, the Ward I Chair for the Lynchburg Republican City Committee, also supported the Republican candidates in his roles with Local 1146." *Id.* Plaintiff contends that "Deputy Chief Wright immediately began a pattern of harassing behavior that created a hostile work environment for Plaintiff." *Id.* ¶ 52. Deputy Chief Wright texted Plaintiff "that he did not approve of Local 1146's post supporting the Republican-affiliated candidates, and that he expected it to be removed."[3] *Id.* ¶ 53. On April 21, he asked Plaintiff "angrily," whether Plaintiff had received the text, and Plaintiff replied "[y]es." *Id.* ¶ 54. Deputy Chief Wright left the fire station after conveying that was all he needed to know. *Id.* ¶ 55. Plaintiff asserts that "[Deputy Chief] Wright's manner was so threatening that Fire Fighter Eric Smith, who was also present, asked Plaintiff, 'Did he come here just to intimidate you?'" to which Plaintiff replied that "it certainly appeared so." *Id.* ¶ 56.

Plaintiff emailed Battalion Chief Carwile to register a complaint, prompting Carwile to email Fire Chief Wormser, "alert[ing] him that Plaintiff believed [Deputy Chief] Wright was trying to 'intimidate and bully him' for his political expression with IAFF." *Id.* ¶¶ 57–68. Carwile stated:

> The actions of Chief Wright must have been clear if a subordinate firefighter [Smith] found his actions to be bullying in nature. Captain Misjuns wants to ensure that his union

---

Plaintiff has had to continue to use his personal laptop to conduct required business for the Department in the course of his employment." *Id.* ¶¶ 47–48.

[3] Plaintiff's Complaint makes no allegations regarding the post itself and what it included.

activities are protected and that he will be free from any intimidation, bullying or retaliation from department administration or city staff. Any such activities could be perceived by Captain Misjuns as creating a possible hostile work environment for him due to his union activities.

*Id.* ¶ 59.

Carwile also told Plaintiff that the City "was preparing a 'Counseling Report' related to" an incident from March 13, 2020. *Id.* ¶ 60. On that date, Captain Jennifer Collins had instructed Plaintiff and his fire crew, to begin "removing furniture, carpentry, and cabinets from a 'shop' room at the fire station," as "[t]he room was being prepared to receive fitness equipment for the use of firefighters while on duty." *Id.* ¶ 50. "Carwile stated that he had been ordered to write the report by Deputy Chief Lipscomb although he personally believed the report was unnecessary, and [he] expressed displeasure that the City was preparing a Counseling Report independently of the standard LFD chain of command." *Id.* ¶ 60. Further, Carwile repeatedly told Plaintiff that Deputy Chief Wright "was 'on the warpath' against Plaintiff." *Id.* He said the City "'had never seen anything like' the negative reaction to Plaintiff's support for the Republican candidates, and that he believed the order to prepare the Counseling Report could be retaliation for the political expression by Plaintiff and the union." *Id.*

Soon after, on May 3, 2020, LFD put a Counseling Report (the "Report") in Plaintiff's personnel file, and the Report said a senior LFD staff member should have cleared the tile removal before Plaintiff undertook the task. *Id.* ¶ 61. It "advised Plaintiff to clear any such work with superiors in the future." *Id.* Plaintiff filed a written objection to this Report being filed in his personnel file, reminding Carwile of their personal discussion earlier about Deputy Chief Wright being on a warpath against Plaintiff. *Id.* ¶ 62. "Plaintiff expressed his belief that the Counseling Report, in effect a reprimand, had been placed in his personnel file by way of retaliation for his activities on behalf of Local 1146, related to the union's support of Republican-affiliated City

Council candidates." *Id.* ¶ 63. Further, Plaintiff alleged that because of his "good-faith report of workplace discrimination," when he arrived to work on June 8, 2020, LFD "instructed him to undergo questioning with attorney Jennifer Royer," which took over three hours. *Id.* ¶ 64. And on November 2, 2020, Chief Wormser gave Plaintiff a letter, in which the City "alleged that Plaintiff's claims were unsupported and impliedly baseless." *Id.* ¶ 65.

Additionally, Plaintiff has two Facebook social media pages: a "'personal page' identifying him as 'Marty Misjuns,'" and a "'public figure' page, identifying [him] as 'Martin J. Misjuns, Ward I Chair – Lynchburg Republican City Committee." *Id.* ¶ 66. These pages do not identify him as a city employee or a Fire Captain. *Id.* And he posts political messages regularly on both pages. *Id.* ¶ 67.

On January 26, 2021, he posted four editorial cartoons on his public figure page. *Id.* ¶ 70. Plaintiff describes this posting:

> Two of the cartoons depict a person with facial hair coming out of a women's bathroom to the consternation of female figures drawn nearby. One depicts a large person with facial hair and dressed in women's clothing saying, 'Hey federal government! Get out of our bedroom… We need you in the bathroom.' The fourth depicts an exaggeratedly large person with an 'Equality Act' t-shirt playing sports against an exaggeratedly small woman who yells 'Not fair!' Above the cartoons, Plaintiff posted the statement '#BidenErasedWomen – Coming to your daughter's high school locker room in the near future.

*Id.* ¶ 70; *see also* Dkt. 21-2 at 7–10. Plaintiff contends that the post is satirical "and clearly intended to express opposition to the 'Equality Act,' which would require an end to separate-sex bathrooms and locker rooms in school facilities, including public, private, and religious schools." Amend. Compl. ¶ 71. In Plaintiff's view, whether the Act is good policy is "a matter of public concern," and "has generated massive opposition from participants in girls' sports programs and persons concerned about the effects of the Act on religious freedom." *Id.* ¶ 72. He further argues that "[t]he cartoons are protected free speech," as is "Plaintiff's right to re-post the cartoons,"

and "Plaintiff's right to add his own personal comments which reveals his intent in reposting the editorial concerns – his belief that the Act should be opposed out of concern that it will impose severe costs on women and girls in restroom facilities and sports programs." *Id.* ¶¶ 73–75.

On his public figure page, Plaintiff posted a meme on February 1, 2021, which stated: "In the beginning, God created Adam & Eve. Adam could never be a Madam. Eve could never become Steve. Anyone who tells you otherwise defies the one true God." *Id.* ¶ 68; *see also* Dkt. 21-2 at 6. Plaintiff alleges that this "expressed [his] deeply held religious beliefs." Amend. Compl. ¶ 69.

Plaintiff asserts that Mayor Dolan, City Manager Wodicka, and Vice Mayor Wright "began to conspire together to deny Plaintiff his constitutional right to express his deeply held religious beliefs and political views on matters of public concern." *Id.* ¶ 84.[4] Dolan emailed Wodicka on January 29, 2021, stating:

> This needs to be addressed! We need to have zero tolerance for this type of activity on the part of City employees. I know this is not the first time this person has displayed questionable if not unconscionable rhetorical post [sic] on his social media platforms…. Please let's talk about a meeting to discuss.

*Id.* ¶ 88; *see also* Dkt. 21-2 at 16. Wodicka replied to Dolan by email on February 4, 2021, copying Dolan and Vice-Mayor Wright: "Mary Jane: Beau and I just spent some time talking this over. Maybe you and I can talk about it a little more tomorrow." Amend. Compl. ¶ 90; *see also* Dkt. 21-2 at 19.

---

[4] He alleges that "Dolan and [Vice-Mayor] Wright are partisan Democrats, while Plaintiff's 'public figure' page identifies him as Ward I Chair for the Lynchburg Republican City Committee," "Wright served in the administration of Barack Obama as Senior Deputy Director of Operations and Director of Finance," and "[a]ccording to the Virginia Public Access Project ('VPAP'), Dolan has made over $20,000 in Virginia political donations. Nearly all donations were to Democrats, including Governor Ralph Northam and Attorney General Mark Herring. A handful were to independents. None were to Republicans." *Id.* ¶¶ 85–87; *see also* Dkt. 21-2 at 14–15.

And on February 3, 2021, Wodicka emailed a citizen complainant, stating: "I have viewed the information that was posted online and I agree with you that this is not the sort of culture that the City intends to create or support… Please understand that this is a personnel matter that will be addressed appropriately…." Amend. Compl. ¶ 89; *see also* Dkt. 21-2 at 17–18.

Plaintiff contends that "Dolan has continued to press her campaign to convince other City leadership to retaliate against Plaintiff for expressing his deeply held religious beliefs." Amend. Compl. ¶ 91. For example, Dolan wrote in an email to another citizen complainant: "I was speechless when I saw what Mr. Misjuns posted. I am totally in agreement with you and do not support or will not tolerate this type of malicious rhetoric. No question his comments are unconscionable, and City Leadership needs to take action." *Id.*

On March 15, 2021, "Plaintiff prepared and circulated on Facebook a petition, asking readers to email the Mayor, City Council and the City Manager requesting that the Mayor honor her oath of office to protect and defend the Constitution, by protecting Plaintiff's First Amendment rights of political speech." *Id.* ¶ 98. Plaintiff alleges on information and belief that Wormser sent Plaintiff a letter, based on "instructions from one or more of Dolan, [Vice-Mayor] Wright, and Wodicka," on March 25, 2021, ordering Plaintiff to attend an "interrogation" regarding citizen complaints about his online posts.[5] *Id.* ¶ 76; *see also* Dkt. 21-2 at 11–13. Wormser told Plaintiff that he was being investigated for his social media statements criticizing Dolan politically, "after Dolan sought to have city staff retaliate against Plaintiff for posting the

---

[5] "Wormser cited language in the 'complaints' calling Plaintiff 'vile,' 'hateful,' 'bigoted,' 'dehumanizing,' 'hostile,' and 'dangerous' for posting the cartoons and the meme." Amend. Compl. ¶ 79. Plaintiff further alleges on information and belief that "there were a relative handful of 'citizen complaints,' and most of those came from individuals affiliated with LGBTQ group 'Hill City Pride.'" *Id.* ¶ 77.

cartoons."[6] And Plaintiff alleges that Wormser attempted to effectively impose "a gag order" on Plaintiff, stating, "You are ordered not to discuss this matter in any manner with anyone other than: your religious leader, your counselor, your immediate chain of command, your observer…, and those assigned to conduct this investigation." Amend. Compl. ¶ 80.

When an LFD employee must undergo an interrogation, a report documenting the interrogation is placed in the employee's file, and the report is "considered in determining whether the employee will be retained, fired, promoted, or demoted." *Id.* ¶ 81. Plaintiff asserts that having him undergo an interrogation and placing an interrogation report in his file "constitutes adverse employment action, all based exclusively on Plaintiff's private, political speech on matters of public concern." *Id.* ¶ 82. The citizen complaints do not allege that he "exercised any partiality toward anyone in the conduct of his job as a firefighter, or questioned any statements made by Plaintiff in the course of his job duties." *Id.* ¶ 83.

On May 10, 2021 Fire Chief Wormser informed Plaintiff that he decided to suspend Plaintiff from his employment. *Id.* ¶ 103. Deputy Chief Lipscomb ordered Plaintiff to attend a second "interrogation" on June 27, 2021, and that "interrogation" occurred on August 2, 2021. *Id.* ¶¶ 104–05. Plaintiff alleges that, "[i]n the interim, Lipscomb worked to collect false reports accusing Plaintiff of creating a hostile work environment for fellow employees, with the intent to use the false reports to build a record for Wormser to fire Plaintiff." *Id.* ¶ 106. On October 18, 2021, Wormser informed Plaintiff "via letter that he had made the determination to fire Plaintiff." *Id.* ¶ 107. Plaintiff appealed this decision "in accordance with the city's grievance procedures, ending with his appeal going before the City's 'Employee Appeal Board' ('Appeal

---

[6] Plaintiff does not allege further facts regarding this retaliation.

Board')." *Id.* ¶ 108. He had intended "to complete his career with the Fire Department until reaching retirement age." *Id.* ¶ 111. But the Appeal Board upheld the firing. *Id.* ¶ 110.

Plaintiff asserts that "Defendants' retaliation against Plaintiff stands in stark contrast to their treatment of Wormser, who attended and supported a protest put on by the group 'Black Lives Matter' ('BLM') on July 4, 2020, at Miller Park in Lynchburg," which Wormser participated in while wearing his full LFD uniform. *Id.* ¶¶ 93–94; *see also* Dkt. 21-2 at 20 (photograph of Wormser in uniform at the protest). Plaintiff asserts that Wormser's actions violated Chapter 7, Article I, Section H.1 of the City's "Employment Policies & Procedures" handbook, which states "City employees may participate in political activities while they are off duty, **out of uniform** and not on the premises of their employment with the City." Amend. Compl. ¶ 95 (emphasis in Amend. Compl.). By contrast, Plaintiff alleges that he took his actions on personal time and out of uniform. *Id.* Plaintiff further alleges on information and belief that "Defendants took no adverse employment action against Wormser, nor did they even question his attendance at a political rally in full uniform." *Id.* ¶ 97.

An Appeal Board member, Stephanie Berkland, approached Plaintiff in late August 2022, and she told him "the only reason his termination was upheld was because he 'spoke up against the Mayor' by producing the Facebook petition." *Id.* ¶ 113. "She advised that every other charge against Plaintiff was a non-factor in the decision or was proven to be unfounded." *Id.* ¶ 114. He lost his replacement employment and has not been able to find similar employment since. *Id.* ¶¶ 121–22.  He has lost his Virginia Retirement System ("VRS") benefits, suffered continuing lost wages, and has lost entitlement to the Public Service Student Loan Forgiveness Program, despite having "some $55,000 remaining in unpaid student loans which would have been paid under the Program, but for his firing." *Id.* ¶¶ 125–28. He also incurred lost wages via having to

11

withdraw from his wife's investment accounts and having to "cash out some $35,000 available to him as already accrued from his VRS benefits," in addition to "suffer[ing] scorn and public ridicule, directly from Defendants and their supporters in the public." *Id.* ¶ 131.

Plaintiff filed an Amended Complaint against the City of Lynchburg, the Lynchburg Fire Department,[7] Mary Jane Tousignant Dolan in her official capacity, Beau Wright in his official capacity, and Reid Wodicka in his official capacity.[8] Dkt. 24. Defendants filed a motion to dismiss, Dkt. 25, which has been fully briefed and argued, thus making it ripe for review.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)). "Thus, when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Nevertheless, only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at

---

[7] Plaintiff and Defendants have since agreed that LFD lacks capacity to be sued, a standard determined by state law. Dkt. 29 at 7; Fed. R. Civ. P. 17(b); *see also Mukuna v. Gibson*, No. 1:11-cv-493, 2011 WL 3793336, at *5 n.2 (E.D. Va. Aug. 25, 2011) (citing Fed. R. Civ. P. 17(b)(3)). Thus, claims against LFD will be dismissed.

[8] Plaintiff and Defendants have since agreed that the claim against each Individual Defendant in his or her official capacity "should be dismissed as duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Hicks v. Halifax Cnty. Bd. of Educ.*, 93 F. Supp. 2d 649, 667 (E.D.N.C. 1999)); Dkt. 29 at 7. As all claims brought against the Individual Defendants were brought against them in their official capacities only, all claims against them will thus be dismissed.

555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570. *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). And a court may consider matters outside the complaint when evaluating a motion to dismiss if it is authentic and integral to the complaint. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

### III.       Analysis

### A.  Plaintiff States a Claim Against the City for Violation of His Rights Under the First Amendment Speech Clause

Plaintiff makes two assertions regarding how the Individual Defendants violated his First Amendment speech rights: (1) they subjected him to an investigation into citizen complaints about his Facebook posts, and (2) they retaliated against him for supporting Republican City Council activities for his union activities. Plaintiff alleges that the Individual Defendants directed the Fire Chief to investigate the complaints that Plaintiff's posts related to the Equality Act were transphobic. Further, Plaintiff attached to his complaint email communications between the Individual Defendants and between the Individual Defendants and the citizen complainants. Dkt. 21-2 at 16–19. The Court concludes that these exhibits support the likelihood that Individual Defendants took employment action against Plaintiff or otherwise directed or interfered with such actions.[9]

---

[9] A court may consider an exhibit at the motion to dismiss stage when it is "integral to and explicitly relied on in the complaint" and authenticity is not disputed. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). "A document is integral to a complaint where its very existence, and not the mere information it contains, gives rise to the legal rights asserted or where the legal rights at issue in the complaint rely heavily upon its terms and effect." *Moler v. Univ. of Md. Med. Sys.*, No. 1:21-cv-01824, 2022 WL 2716861, at *2 (D. Md. July 13, 2022) (internal quotation marks omitted). For this motion to dismiss, the Court will consider Plaintiff's exhibits, as they are incorporated by reference in his Amended Complaint.

"A plaintiff seeking to recover for First Amendment retaliation must allege that (1) []he engaged in protected First Amendment activity, (2) the defendants engaged in action adversely affecting [his] First Amendment rights, and (3) there was a causal relationship between [his] protected First Amendment activity and Defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)). Plaintiff sufficiently alleges facts supporting these elements at this early stage of litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining Plaintiff must allege facts allowing the Court to "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged.").

"[S]tatements by public officials on matters of public concern must be accorded First Amendment protection." *Pickering v. Bd. of Ed. Tp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 574 (1968). And "[s]peech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 343 (4th Cir. 2017). Plaintiff's speech, in addressing the Equality Act and partisan political support, thus involved a matter of public concern.

Plaintiff alleges that the Individual Defendants, in response to his social media posts, expressed their outrage and demanded that City leadership act. Amend. Compl. ¶ 91. Plaintiff also provides Exhibit 8, an email from City Council member Ms. Dolan to the Interim City Manager Dr. Wodicka, which shows Dolan requesting a meeting to discuss that Plaintiff's posts fail to reflect the city's "values of diversity, equity, and inclusion." Dkt. 21-2 at 16. Further, Plaintiff alleges that Dolan emailed a citizen complainant and told the complainant she would not "support or tolerate this type of malicious rhetoric" that Plaintiff put forward. Amend. Compl. ¶ 201.

Plaintiff's Exhibit 9 is an email exchange between Interim City Manager Dr. Wodicka and a citizen complainant. Wodicka responded to the complainant by telling the individual the City was an "inclusive community" that is "called to respect the differences among the diverse members of our community." Dkt. 21-2 at 17. Wodicka told the complainant that he regretted her feeling the need to complain and advised her that "this is a personnel matter" and the City had a policy "not to discuss personnel matters in public." *Id.* at 17–18.

Plaintiff's Exhibit 10 is an email Wodicka sent to Dolan, which also included Vice-Mayor Wright in the addressee line. Dkt. 21-2 at 19. Wodicka told Dolan that he and Wright spent time talking the situation over and asked if Dolan could further discuss it the next day. *Id.* The subject line is "RE: Marty Misjuns must be held accountable." *Id.*[10]

Taking the facts alleged in the light most favorable to Plaintiff, as is required at the motion to dismiss stage, Plaintiff's allegations sufficiently demonstrate, based on the close proximity in time between when the emails were sent and when the City-sanctioned investigation into citizen complaints occurred, that City officials disciplined Plaintiff based on his protected speech.[11] Thus, Plaintiff's First Amendment speech claim will survive.

### B. Plaintiff States a Claim Against the City for Violation of His First Amendment Free Exercise of Religion Right

---

[10] The prior emails to which this email replied are not included as exhibits, and there is no indication as to who wrote the subject line.

[11] At the summary judgment stage, the Court may determine whether Plaintiff's "interest in speaking outweighs the government's interest," and in doing so must "consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 345 (4th Cir. 2017) (quoting *Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014) (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

Plaintiff asserts that he was investigated for a "religious" social media post, dated February 1, in which he makes references to God, Adam, and Eve. Amend. Compl. at 11–13. Plaintiff alleges that Defendant Dolan wrote to a "citizen complainant" stating: "I am totally in agreement with you and . . . will not tolerate this type of malicious rhetoric. No question [Plaintiff's] comments are unconscionable, and City Leadership needs to take action." Amend. Compl. ¶ 201. Plaintiff explains that he only made one comment on his January 26 cartoons post, and his only other "comment" was his February 1 'religious' meme. Dkt. 29 at 11 (citing Amend. Compl. ¶¶ 69, 67). Further, Exhibit 6 shows Fire Chief Wormser noting that in Plaintiff's Petition directed to Defendant Dolan, Plaintiff referenced in his online petition that Dolan "DEMANDED ACTION from city staff in order to satisfy the far-left activist group stating that [Plaintiff] intended to do harm to the transgender community with [his] speech." Dkt. 21-2 at 13. Wormser described this group as "wish[ing] for transgender and transitioning individuals to enter the public restrooms of their choice based on the gender they identify with, rather than the gender God made them as [] at birth"—an idea Plaintiff's February 1 post opposed. *Id.* Thus, taking the facts alleged in the light most favorable to Plaintiff, the Court concludes that Plaintiff has sufficiently alleged, under the *Twombly* pleading standard, that Defendants' retaliatory actions against him were due to religious beliefs, not just political beliefs.

## C. Plaintiff Fails to State an Equal Protection Claim Under the Fourteenth Amendment

Next, Plaintiff asserts that Individual Defendants treated him differently than Chief Wormser, which he contends gives rise to an Equal Protection Claim under the Fourteenth Amendment. The claim fails, however, because he has failed to allege facts establishing that he and Wormser were similarly situated. "[T]o survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated

16

differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011 (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). To bring an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination." *Kolbe v. Hogan*, 849 F.3d 114, 116 (4th Cir. 2017) (en banc) (citing *Morrison*, 239 F.3d at 654). And "persons who are in all relevant aspects alike are 'similarly situated.'" *Frye v. Brunswick Cnty. Bd. of Educ.*, 612 F. Supp. 2d 694, 706 (E.D.N.C. 2009) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Though both Plaintiff and Wormser were employees for the City, they occupy different titles and positions. Further, they were not involved in the same activity—Wormser did not post political or religious memes on social media, and Plaintiff did not participate in a public event in uniform. Nor are there any allegations that Wormser was the subject of multiple citizen and/or employee complaints, as was Plaintiff. And while "all persons similarly circumstanced shall be treated alike," under equal protection law, the government is not required to treat dissimilar persons similarly. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). As Plaintiff and Wormser were not similarly situated, Plaintiff's equal protection claim will be dismissed.

### D. Intracorporate Immunity Doctrine Bars Plaintiff's Conspiracy Claim and Plaintiff Fails to State a Claim for Conspiracy to Violate His Constitutional Rights

Plaintiff claims that the Individual Defendants conspired to deprive him of his civil rights. Because Dolan and Vice-Mayor Wright are City officials and Wodicka was the Interim City Manager, the Individual Defendants are entitled to intracorporate immunity for the actions Plaintiff asserts they took in furtherance of a conspiracy to deprive him of his civil rights. Thus, his conspiracy claim will be dismissed.

17

The intracorporate immunity doctrine "deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting within the scope of their employment/agency." *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013) (internal citations omitted). Accordingly, there can be no claim for conspiracy against employees or agents of the same entity acting within the scope of their employment/agency. *E.g.*, *Park v. Vector Resources Group, Ltd.*, 485 S.E.2d 140, 144 (Va. 1997); *see also Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); *Vollette v. Watson*, 937 F. Supp. 2d 706, 729 (E.D. Va. 2013) (applying intracorporate immunity to sheriff and sheriff's deputy defendants).

Individual Defendants, as agents of the City acting in their official capacities, cannot conspire with one another unless doing so to engage in activity contrary to the City's wishes, directive, or policy. *High Peak Partners, LLC v. Bd. of Supervisors of Prince George Cnty., VA*, No. 3:07CV757-HEH, 2008 WL 1733605, at *4 (E.D. Va. Apr. 14, 2008). Plaintiff has alleged no facts supporting that the Individual Defendants were acting contrary to the City's wishes, directive, or policy. Plaintiff argues that the Individual Defendants conspired with citizen complainants, Dkt. 29 at 15–16, but the facts alleged do not support such a conspiracy. And it would create First Amendment policy concerns if citizens expressing their opinions to local officials automatically created a conspiracy between the citizens and officials. *C.f. McDonald v. Smith*, 472 U.S. 479, 482 (1985) (discussing the First Amendment right "to petition the Government for a redress of grievances").

Even if Plaintiff were correct that intracorporate immunity is inapplicable to this case, Plaintiff fails to allege sufficient facts to bring a plausible claim under 42 U.S.C. § 1985. Plaintiff relies on 42 U.S.C. § 1985 to bring his claim that Defendants Dolan, Wright, and Wodicka

conspired to deprive Plaintiff of his civil rights. Amend. Compl. ¶ 196. To succeed on a claim for

conspiracy to deny equal protection of the laws under § 1985, a plaintiff must establish:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting Simmons *v.*

*Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)). And "[t]o meet the requirement of a class-based

discriminatory animus, under this section the class must possess the 'discrete, insular and

immutable characteristics comparable to those characterizing classes such as race, national

origin, and sex.'" *Buschi*, 775 F.2d at 1257 (quoting *Bellamy v. Mason's Stores, Inc.*, 368 F.

Supp. 1025, 1028 (E.D. Va. 1973), *aff'd*, 508 F.2d 504 (4th Cir. 1974)). Plaintiff, as discussed

above, failed to allege sufficient facts to show he has been deprived of the equal protection of the

laws by any of the Individual Defendants. And he has failed to allege sufficient facts that the

Individual Defendants were motivated by a specific class-based discriminatory animus. Thus, the

§ 1985 claim fails. The Court need not consider the other § 1985 elements.

### E.  Plaintiff Fails to State a Claim Against the Individual Defendants for Wrongful Termination

In arguing that Defendants wrongfully terminated him, Plaintiff claims that they "violated

Virginia statutory policy 'enabling the exercise of an employee's statutorily created right'" as

expressed in Virginia Code § 15.2-1512.2, and that they "violated a public policy 'clearly

expressed in the statute' in Section 15.2-1512.2." Amend. Compl. at 32–33 (internal citation

omitted). As he fails to allege what public policy is "clearly expressed" in that statute or how the

Individual Defendants violated it, his claim fails.

"Virginia adheres to the common-law rule that when a contract calls for the rendition of services, but the period of its intended duration cannot be determined by a fair inference from its provisions, either party is ordinarily at liberty to terminate the contract at will upon giving reasonable notice of intention to terminate." *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 798, 800 (Va. 1985) (citations omitted); *see also, e.g.*, *Hice v. Mazzella Lifting Techs., Inc.*, No. 2:21-cv-281, 2022 WL 636640, at *8 (E.D. Va. Mar. 4, 2022). However, the common-law rule governing at-will employment termination "is not absolute." *Id.* at 801. Employees "discharged in violation of an established public policy" fall within an exception to the common-law rule, and they may raise a *Bowman* claim for wrongful discharge if within the exception. *Id.*

The Supreme Court of Virginia has recognized three situations in which a discharged employee may show his discharge violated public policy. *Wells v. Enter. Leasing Co. of Norfolk/Richmond, LLC*, 500 F. Supp. 3d 478, 487 (E.D. Va. 2020) (internal citations omitted). First, a litigant may rely on "a statute stating explicitly that it expresses a public policy of the Commonwealth." *Id.* Second, a litigant may rely on a statute "designed to protect the property rights, personal freedoms, health, safety or welfare of the people in general." *Id.* (internal citation omitted). For both the first and second situation, the aggrieved employee must also show that she "is a member of the class of individuals the public policy is intended to benefit." *Id.* (internal citation omitted). Virginia case law makes clear that "[t]he public policy on which a plaintiff must rely to qualify for the first and second *Bowman* exceptions must be expressed in an existing Virginia statute." *Id.* at 487–88 (parenthetically summarizing supporting case law). A *Bowman* claim cannot rely on a federal statute or constitutional provision. *E.g.*, *McCarthy v. Texas Instruments*, 999 F. Supp. 823, 829 (E.D. Va. 1998) ("This effort is facially unavailing, as Title VII, a federal statute, does not provide an expression of Virginia's public policy. A *Bowman*

claim must find root in a *state* statute. For this reason, too, a plaintiff's reliance on the Fourteenth Amendment . . . is misplaced.") (internal citation omitted). Third, a *Bowman* claim may be established "where the discharge was based on the employee's refusal to engage in a criminal act." *Id.* (internal citation omitted).

The hook Plaintiff tries to use for his *Bowman* claim is Virginia Code § 15.2-1512.2, which dictates that "no locality shall prohibit any employee of the locality, including firefighters, . . . from participating in political activities[12] while these employees are off duty, out of uniform and not on the premises of their employment with the locality." Va. Code § 15.2-1512.2(B). The political activities protected "fall[] into one of two categories: political organization or political campaign participation." *Loftus v. Bobzien*, 848 F.3d 278, 291 (4th Cir. 2017). Section 15.2-1512.2 "does not create any private right of action." *Id.* Further, the statute does not state explicitly that it expresses a public policy of Virginia.

Plaintiff argues that the Individual Defendants violated the statute by terminating him for circulating a petition asking Dolan to "protect[] [his] First Amendment rights to political

---

[12] Under the statute, these include but are not limited to:

> voting; registering to vote; soliciting votes or endorsements on behalf of a political candidate or political campaign; expressing opinions, privately or publicly, on political subjects and candidates; displaying a political picture, sign, sticker, badge, or button; participating in the activities of, or contributing financially to, a political party, candidate, or campaign or an organization that supports a political candidate or campaign; attending or participating in a political convention, caucus, rally, or other political gathering; initiating, circulating, or signing a political petition; engaging in fund-raising activities for any political party, candidate, or campaign; acting as a recorder, watcher, challenger, or similar officer at the polls on behalf of a political party, candidate, or campaign; or becoming a political candidate.

Va. Code § 15.2-1512.2(C).

speech." Amend. Compl. ¶ 98.[13] But this is an attempt to shoehorn his First Amendment claim into the *Bowman* framework, and a *Bowman* claim must rely on a state statute that provides an expression of state public policy. Thus, Plaintiff has failed to allege sufficient facts to support a *Bowman* claim for wrongful termination.

Plaintiff argues that under the unconstitutional conditions doctrine, even in an employment at will state like Virginia, the government cannot condition public employment on an employee's willingness to sacrifice rights of speech and religious expression. Dkt. 29 at 18. Under the unconstitutional conditions doctrine, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Plaintiff's constitutional claims have been addressed above and need not also be considered through his wrongful termination claim. Thus, the wrongful termination claim will be dismissed.

### F. Plaintiff Fails to State a Claim for Municipal Liability Against the City of Lynchburg Under Section 1983

Though Plaintiff brings suit against the City under § 1983, "a municipality cannot be held liable solely because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691

---

[13] He contends that a citizen member of the City's Appeal Board, Stephanie Berkland, confirmed this information four months after his termination was upheld and his grievance denied. *Id.* ¶¶ 112–13. Ms. Berkland is not alleged to be a City employee and there are no allegations that the Individual Defendants had any responsibility over her, so they would not be liable for her decision as a member of the Appeal Board. And the allegations indicate Plaintiff's termination was not based on circulating a petition. The investigation explored whether Plaintiff made statements that violated the City's personnel policy, outlined in Chapter 7, Section VI, Subsection M-5 of the Personnel Manual—not whether circulating a petition violated the personnel policy, leading to his termination. Dkt. 21-2 at 11–13 (Notice of Complaint Letter). And the Letter of Final Determination presented that, after a meeting provided Plaintiff "with an opportunity to show cause as to why [his] employment should not be terminated," he "failed or refused" to fulfill Wormser's "request that [Plaintiff] provide [Wormser] with the identity of a witness that [he] asserted would confirm some of the information in [Plaintiff's] presentation, so that [Wormser] could interview that person." *Id.* at 21.

(1978). Municipal corporations are not vicariously liable under § 1983 for their employees' actions under a theory of *respondeat superior*. *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (also explaining that "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983" "[i]n limited circumstances"); *Pembaur v. Cinncinati*, 475 U.S. 469, 479 (1986). Instead, liability only attaches to the municipality directly, as opposed to its officials in their official capacity, in cases where the municipality causes the deprivation "through an official policy or custom." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). The Fourth Circuit has recognized that

> [a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Id.* (quoting *Carter*, 164 F.3d at 218). But Plaintiff has alleged no facts indicating that the City acted through an express policy, through decisions of persons with final policymaking officer, through any omission manifesting deliberate indifference to the rights of citizens, or through a practice so persistent and widespread as to constitute a custom or usage with the force of law. Thus, Plaintiff's claims that the City violated his First and Fourteenth Amendment rights will be dismissed.[14]

---

[14] Plaintiff, however, argues that the following allegations show an official policy or custom resulted in his termination: Defendant Dolan wrote: "We need to have zero tolerance for this type of activity on the part of City employees," Amend Compl. ¶ 87, and "No question his comments are unconscionable, and City leadership needs to take action," *id.* ¶ 90. Wodicka wrote: "[T]his is not the sort of culture the City intends to create or support. . . . Please understand that this is a personnel matter that will be addressed appropriately." *Id.* ¶ 98. Chief Wormser advised him that his political speech "renders [Plaintiff] unfit to serve as a leader in the Lynchburg City fire department." Dkt. 21-2 at 13. And Wormser advised that he would

### G. Plaintiff Fails to State a Claim Against the City of Lynchburg for Breach of Contract

Plaintiff brings a breach of contract claim against the City, alleging that the City's "Employment Policies & Procedures" handbook constitutes a binding contract between him as an employee and Defendants as his employers. Amend. Compl. ¶ 134. But this handbook expressly disclaims representing any contractual rights, defining the nature of the relationship between the City and its employees in Chapter 1, Article V:

> Virginia is an 'employment at will' state and employees of the City of Lynchburg do not have a contract of employment. Neither these policies nor any other document constitutes an express or implied employment contract or any right to continued employment. These policies do not imply or create a vesting or a contract entitling City employees to any specific benefits or policies from the City. The contents of this manual and the City of Lynchburg's policies and procedures may be changed at any time as long as they are in compliance with all applicable Federal, State, and local employment laws and regulations.

Plaintiff is an at-will employee, Dkt. 26 (Ex. 3) (City's "Employment Policies & Procedures" Handbook), and Virginia law clearly establishes that no property interest exists in "employment at will." *Johnston v. William E. Wood & Assocs., Inc.*, 787 S.E.2d 103, 104 (Va. 2016) ("The at-will doctrine constitutes a cornerstone of the Commonwealth's employment law (internal citations omitted); *Skeeter v. City of Norfolk*, 681 F. Supp. 1149, 1155 (E.D. Va. 1987) ("[U]nder Virginia law, 'at will' employment creates no property interest.") (citing *Norfolk Southern Ry. Co. v. Harris*, 59 S.E.2d 110, 114 (Va. 1950)). As Plaintiff is an at will employee, he has no property interest in his employment.

---

"conduct[] an investigation into this matter and whether your conduct violates City policies." *Id.* Plaintiff contends that "[e]vidently, the City concluded it did, as Plaintiff was terminated via letter from Wormser on October 18, 2021." Dkt. 29 at 19 (citing Dkt. 21-2 at 21). So Plaintiff asserts that he "adequately pleaded the existence [of] the decisions of a person with final decision-making authority (Wormser), and policy or custom as expressed in the words of multiple City officials." *Id.* at 19–20. But this is overly speculative—the facts alleged do not support the existence of an official policy or custom.

Though Plaintiff asserts that the City's "Employment Policies & Procedures" handbook provides a contractual right to enforcement based on the common law doctrines of offer and acceptance, the City made no such offer. Thus, Plaintiff has failed to state any common law breach of contract action, so this claim will be dismissed.

Plaintiff also argues that "the City is contractually binding itself to the non-discrimination provision of *Sindermann*, that the City will not impose unconstitutional conditions on employment, such as the waiver of Free Speech and Free Exercise rights," Dkt. 29 at 20, because on page 5 the Handbook states: "The City of Lynchburg will make all decisions regarding recruitment, hiring, promotions, reassignments, training, and other terms and conditions of employment without unlawful discrimination." Amend. Compl. ¶ 141. As discussed above, Plaintiff's First Amendment claims will go forward, while the Equal Protection Clause claim will be dismissed; there is no need to separately consider Plaintiff's constitutional arguments through a contract-based argument.

## Conclusion

For the foregoing reasons, Plaintiff's First Amendment claims against the City, based on suing the Individual Defendants in their official capacities and brought pursuant to § 1983, survive. All of Plaintiff's other claims are dismissed.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __20th__ day of April, 2023.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

25